**JOY MANUFACTURING CORPORATION, a Pennsylvania Corporation, Plaintiff,**

v.

**The PULLMAN–PEABODY COMPANY, Thomas M. Begel, Gerald R. Ford, Jane Mack Gould, John E. McConnaughy, Jr., Edward A. Montgomery, Jr., James R. Shepley, Steven Shulman, Yedco**

Partners L.P., Yed Corp., CCI Acquisition Corp. and Pullman Acquisition Company, Defendants,

and

Cynthia Berger, Custodian for Andrew C. Berger, Plaintiff in Intervention.

Civ. A. No. 86–2592.

United States District Court, W.D. Pennsylvania.

Dec. 1, 1989.

J. Tomlinson Fort, Reed Smith Shaw & McClay, Pittsburgh, Pa., for plaintiff.

Michael P. Malakoff, Berger, Kapetan, Malakoff & Meyers, P.C., Pittsburgh, Pa., for plaintiff in intervention.

William M. Wycoff, Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendants.

## OPINION

DIAMOND, District Judge.

The matter presently before the court is a petition for attorneys' fees filed by proposed intervenor, Cynthia Berger. For the reasons which follow, the motion will be granted.

### I. *Background*

Commencing sometime in September 1986, the defendant Pullman–Peabody Company ("Pullman") contacted the plaintiff, Joy Manufacturing Corporation ("Joy"), through the latter's President, Chairman, and Chief Executive Officer,

William Calder, and expressed an interest in acquiring control of Joy. Between then and December 1, 1986, Pullman made a number of attempts to obtain the approval of Joy to the proposed acquisition. These efforts were unsuccessful, however, and on December 1, 1986, Pullman announced that it was commencing a hostile cash tender offer the next day to acquire all of the shares of Joy at a price of $31.00 per share (the "tender offer"). Joy stock closed at $25.50 on December 1, 1986. Pullman's offer was conditioned, *inter alia*, on the redemption by the Joy board of directors of rights issued pursuant to a Rights Agreement, dated May 20, 1986, between Joy and Mellon Bank, N.A. (the "Poison Pill") and on the Joy board taking appropriate action to prevent the triggering of a pension termination plan (the "pension parachute") adopted by Joy on March 17, 1986. For convenience, the Rights Agreement and the pension termination plan collectively are referred to at times herein as "poison pills."

Contemporaneously with its tender offer, Pullman brought suit against Joy in the United States District Court for the District of New Jersey wherein it sought a judgment declaring Joy's pension termination plan to be invalid and an injunction against its implementation. On December 9, 1986, Judge, then Chief Judge, Clarkson S. Fisher granted Joy's motion to dismiss the Pullman action on the ground, among others, that Pullman lacked standing to challenge the pension parachute because of the lack of contemporaneous stock ownership by Pullman. In other words, Pullman lacked standing to challenge the pension termination plan because it was in place when Pullman first acquired Joy stock on September 19, 1986. Pullman did not attack the stock rights plan. Had it done so, the result would have been the same, since the adoption of that plan also predated Pullman's acquisition of Joy stock.

On December 8, Joy's board of directors unanimously rejected Pullman's tender offer as inadequate and recommended to Joy's shareholders that they not tender their shares to Pullman. The Joy board also authorized the release of confidential information to potential bidders but only upon their execution of a so-called "standstill" agreement whereunder they agreed that for a period of two years they would not attempt to acquire Joy without its prior written approval.

On the same day, Joy commenced the instant action against Pullman seeking a judgment declaring the poison pills to be valid and an order enjoining the Pullman tender offer. In its answer and counterclaim filed on December 12, Pullman sought to have the poison pills declared invalid. On the same day, the petitioner herein, Cynthia Berger, filed a motion to intervene in this action in order to file a derivative class action on behalf of Joy challenging the validity of the poison pills.

Oral argument on the motion to intervene was held on December 15 (references to that proceeding will be "Tr. p. _____"). Initially, the court questioned the need for the proposed intervention since Berger's claim for relief appeared to be virtually identical to the several Pullman counterclaims. (Tr. p. 3). Paul M. Bernstein, Esquire, one of the attorneys for Berger, explained that the Berger intervention was necessary because there was a serious question as to whether or not Pullman adequately could represent the shareholders who formed the derivative class in challenging the poison pills. Mr. Bernstein noted that in the New Jersey suit Chief Judge Fisher had granted Joy's motion to dismiss on the ground that Pullman lacked standing to attack the pension termination plan because Pullman had acquired its stock after that plan had been adopted by Joy. It was likely, therefore, Mr. Bernstein reasoned, that a similar motion filed by Joy earlier that day in the instant action would produce the same result. (Tr. pp. 4–6). Indeed, counsel for Joy agreed with this assessment. (Tr. p. 18). On the other hand, Mr. Bernstein argued, the proposed intervenor, Cynthia Berger, was not vulnerable to such a challenge because she had been a shareholder of Joy continuously for the past seventeen years. Counsel for Joy opposed intervention, while Pullman urged the court to permit it. The court took the

motion under advisement, indicating that it would make a ruling on all outstanding matters before the end of the year but that in the meantime Cynthia Berger could participate in all discovery and other pretrial matters, and she did.

On, or immediately after, December 15, Joy announced that any party interested in acquiring it should submit its bid on or before December 18, 1986. Joy then scheduled a meeting of its board of directors for December 19, 1986, to consider these bids.

In response to the Joy invitation to bid, Pullman increased its offer for all of the common stock of Joy from $31.00 to $34.00 a share and Adler and Shaykin ("A & S") tendered a bid of $35.00 for 94.3% of the common stock of Joy. At a special meeting on December 22, 1986, the Joy board approved a definitive merger agreement with Joy Acquisition Corporation, formed by A & S. The A & S offer provided that if over 94.3% of the shares subscribed, as in fact occurred, all shareholders would be paid in cash and preferred stock of the surviving company on a subsequent merger. Joy became the surviving corporation under the merger agreement.

A telephone status conference in this case was scheduled by the court for December 29, 1986. However, on that day before the conference was scheduled to commence counsel for Joy and Pullman announced that they had agreed to settle and discontinue this litigation. A subsequent press release by Pullman indicated that the settlement included an agreement by Joy to pay to Pullman $750,000.

Although petitioner did not object to the discontinuance of this action or attempt or threaten to interfere with any of the actions contemplated by Joy, Pullman, or A & S, petitioner had advised Joy on December 22, and all parties and the court on December 29 during the status conference call, that petitioner intended to apply for counsel fees and expenses.

## II. *Discussion*

### A. *Contention of the Parties*

Petitioner contends that as the *combined* result of her proposed intervention and the hostile takeover actions of Pullman, the management of Joy concluded that its efforts to prevent a hostile takeover ultimately would fail and that Joy would be vulnerable to purchase by hostile buyers, i.e., those who would operate the company on their own terms including, *inter alia*, the replacement of incumbent officers and directors. As a consequence, petitioner contends, some time on or after December 15, 1986, the day on which the court heard argument on the Berger petition to intervene, the management of Joy decided to put the company on the trading block and to solicit offers from all bidders. (*See* Deposition of Joseph J. Bellas, Vice President and Controller of Joy, Plaintiff-in-intervention, Appendix of exhibits "F", app. 0028–29). All of this according to petitioner, resulted in a 37¼% increase in the value of Joy common stock from $25.50 at close on December 1, 1986, to the $35.00 A & S offer of December 19, ultimately approved by Joy's board on December 22, 1986.

From the foregoing, petitioner contends that she conferred a benefit on the corporation and its shareholders which entitles her to collect attorneys' fees and costs from the corporation. Petitioner argues that all of the shareholders who benefited from the Pullman–Berger actions remained as shareholders following the merger resulting from the A & S tender offer under which Joy became the surviving company. Since the A & S tender offer was fully subscribed, a part of the payment to the tendering shareholders was in the form of preferred stock in the surviving corporation. In addition to the pecuniary benefit resulting from the appreciation in the value of Joy common stock, petitioner contends that the corporation derived an additional benefit from the therapeutic effect resulting from the judicial challenge to the poison pills.

Joy resists the petitioner's attempt to obtain attorneys' fees and costs on several grounds. First, Joy contends that because the intervenor's suit lacked merit the intervenor was not entitled to counsel fees on any theory. Second, Joy argues that there was no causal relationship between the

Berger proposed intervention, alone or in combination with the actions of Pullman, and the decision by Joy management to put the company on the auction block. And, finally, Joy maintains that in any event there was no benefit conferred on the *corporation* to justify assessing fees and costs against it, even though there may have been a benefit conferred on the shareholders.

## B. *Applicable Law*

The petitioner correctly states at page two of her brief that where a party has by his or her effort and expense through litigation created a benefit for others a fee award is appropriate whether or not the litigation is mooted before judgment and regardless of whether there is a monetary fund created from which fees may be paid. *See Kahan v. Rosenstiel*, 424 F.2d 161 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970) and *Koppel v. Wien*, 743 F.2d 129 (2d Cir.1984).

This rule is to be applied liberally, *Thomas v. Honeybrook Mines, Inc.*, 428 F.2d 981 (3d Cir.1970), *cert denied*, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971), and the benefit need not be conferred solely by the efforts of the party seeking compensation. *See Institutionalized Juveniles v. Sec. of Pub. Wel.*, 758 F.2d 897, 916 (3d Cir.1985), for a discussion of the standard applied in the Third Circuit for determining the causal relationship. There the court quoted *Morrison v. Ayoob*, 627 F.2d 669, 671 (3d Cir.1980) (per curiam), for the proposition that: "[t]he action need not be the sole cause. Where there is more than one cause, the plaintiff is a prevailing party if the action was a material factor in bringing about the defendant's action."

It is not necessary that the benefit to a corporation from a derivative suit be pecuniary to justify an award of attorneys' fees. In *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 395, 90 S.Ct. 616, 627, 24 L.Ed.2d 593, 608 (1970), the Supreme Court stated:

> However, an increasing number of lower courts have acknowledged that a corporation may receive a "substantial benefit" from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature [footnote omitted]. A leading case is *Bosch v. Meeker Cooperative Light & Power Assn.*, 257 Minn. 362, 101 NW2d 423 (1960), in which a stockholder was reimbursed for his expenses in obtaining a judicial declaration that the election of certain of the corporation's directors was invalid. The Supreme Court of Minnesota stated: "Where an action by a stockholder results in a substantial benefit to a corporation he should recover his costs and expenses ... [A] substantial benefit must be something more than technical in its consequence and be one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest."

The Court went on to state at p. 396, 90 S.Ct. at p. 628, 24 L.Ed.2d at p. 609:

> But regardless of the relief granted, private stockholders' actions of this sort "involve corporate therapeutics" [footnote omitted] and furnish a benefit to all shareholders by providing an important means of enforcement of the proxy statute. [footnote omitted] To award attorneys' fees in such a suit to a plaintiff who has succeeded in establishing a cause of action is not to saddle the unsuccessful party with the expenses but to impose them on the class that has benefited from them and that would have had to pay for them had it brought the suit.

*Barton v. Drummond Co.*, 636 F.2d 978 (5th Cir.1981), was a case where the plaintiff-shareholders brought suit to enjoin the merger of their corporation into a takeover corporation and the freeze out of a certain class of shareholders in the process. After the suit was brought, the takeover corporation withdrew its proposal to merge the plaintiffs' corporation, and plaintiffs sought counsel fees. On appeal from a denial of attorneys' fees, the United States Court of Appeals for the Fifth Circuit remanded, making several holdings with regard to the applicable law. One of those

had to do with the manner in which attorneys' fees should be awarded. In that regard the Court stated:

Appellant has argued that, under the "common benefit" theory, the logical mechanism for spreading the cost of this litigation among those benefited is the corporation, and we agree. Those cases which define "benefit" under the "common benefit" exception make clear that the recovery of fees from the corporation is an appropriate means of spreading the cost of obtaining the benefit among all the shareholders even where no monetary fund has been created.

*Id.* at 985. (footnotes omitted).

In *Kahan v. Rosenstiel*, 424 F.2d at 166, the United States Court of Appeals for the Third Circuit cited the *Mills* case, *supra,* for the proposition that:

The award of attorney's fees is not limited to circumstances in which there is a monetary fund from which fees may be paid but extends to any situation in which the litigation "has conferred a substantial benefit on the members of an ascertainable class".

*Citing* 396 U.S. at 393–394, and 90 S.Ct. at 626. The Court went on to say:

The rationale of the Court's decision, which held the corporation responsible for the attorney's fees was that all those who benefit from the litigation should share the costs proportionately.

*Id.* at 166–167.

In *Barton v. Drummond Co., supra,* the Fifth Circuit held that where the stockholder's derivative suit has been rendered moot by subsequent action of the defendant the latter has the burden of showing that there was no causal connection between the two in order to defeat the stockholder's claim for legal fees and expenses. *See also McDonnell Douglas Corp. v. Palley,* 310 A.2d 635 (Del.1973); *Koppel v. Wien,* 743 F.2d at p. 135; and *Prudential–Bache Securities, Inc. v. Matthews,* 627 F.Supp. 622 (S.D.Tex.1986).

## C. *Application of Law to this Case*

We believe that the governing principles of law applied to the facts in this case as developed by the affidavits and accompanying documents submitted by the parties favor an award of attorneys' fees to the petitioner.[1]

### 1. *The Berger Suit Had Merit*

In *Kahan v. Rosenstiel*, 424 F.2d at 167, the Third Circuit summarized the law with regard to an award of attorneys' fees where the underlying suit is settled and discontinued before completed on its merits. The court stated:

In order to recover attorney's fees, it is not necessary that suit be brought to a successful completion, since such a requirement might discourage prompt settlements. [citations omitted]. Indeed, in *Mills* [*Mills v. Electric Auto–Lite Co., supra* ] attorney's fees were awarded to plaintiffs although it was not yet determined what relief if any plaintiffs could obtain.

It is necessary to determine, however, that where a suit is filed it is "meritorious" and that it is plaintiff's effort which caused others to benefit. [citations omitted]. In several cases which became moot, courts have said suits were "meritorious" if they could have survived a motion to dismiss. *See e.g., Chrysler Corporation v. Dann* [43 Del.Ch. 252, 223 A.2d 384 (1966) ]; *Rosenthal v. Burry Biscuit Corporation,* 42 Del.Ch. 279, 209 A.2d 459 (1949). [footnote omitted].

In the *Chrysler* case cited by the *Kahan* court, the court defined a meritorious claim as follows:

The crux of the matter is the meaning of the phrase, "meritorious action." Chrysler argues that it means a cause of action which would survive a motion for summary judgment. We think, however, that the rule is not this demanding. A claim is meritorious within the meaning of the rule if it can withstand a motion to dismiss on the pleadings if, at the same

---

1. The parties have proceeded on the petition for costs and attorneys' fees with affidavits and supporting documents. These have been accepted by the court and provide the bases for the factual findings incorporated in this opinion.

time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success. It is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable hope.

223 A.2d at 387. Petitioner's case is meritorious by these standards.

■ Joy's initial contention is that Berger's derivative action on behalf of the corporation would not have withstood a motion to dismiss because she failed first to demand that Joy bring such an action on its own behalf.

Joy argues that as a prerequisite to her right to prosecute the proposed derivative action Berger was required to make a demand on Joy to bring the suit. That is the general rule; however, it also is the rule that if such a demand would be futile, it is excused. *See Lewis v. Curtis*, 671 F.2d 779 (3d Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982), where the court stated that in "determining whether a demand is necessary, [the court] should consider whether a demand on the directors would be likely to prod them to correct a wrong." Berger's suit sought to have the stock rights and pension plans, the poison pills, declared invalid as the products of a breach of fiduciary duty by the Joy board of directors. Joy already had successfully defended a similar action by Pullman in New Jersey and had commenced this suit seeking a judgment declaring those plans to be valid. Surely, it would have been futile for Berger to demand, and naive to expect, the Joy board voluntarily to accede to a demand to reverse a course of action which it assiduously and with some success was pursuing in the courts. A demand was not necessary.

■ Joy next argues that Berger's suit would not survive a motion to dismiss because it lacked substantive merit. Again, we must disagree. Petitioner was not vulnerable to the standing argument which prevailed against Pullman, and the outcome of the action seeking a judgment declaring the poison pills invalid was by no means foregone on its merits in favor of Joy. Measures taken by management, such as the poison pills adopted by Joy, as defenses against unwanted takeovers are suspect and subject to close scrutiny. In *Dynamics Corp. of America v. CTS Corp.*, 794 F.2d 250, 253–55 (7th Cir.1986), *rev'd on other grounds*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), Judge Posner of the United States Court of Appeals for the Seventh Circuit expressed the objections to them in the context of that case in this way:

To allow management to use its control of the board of directors to frustrate all hostile takeovers would nullify an important protection for shareholders. The threat of hostile takeover plays a vital role in keeping management on its toes. CTS has been a troubled firm of late; a major acquisition (which Dynamics, long a major shareholder, opposed) soured, and was written off at a large loss. If CTS's management is allowed to insulate the company from any change of control to which management does not agree, the shareholders may be unable to realize the potential value of their investment. Maybe under different control, specifically Dynamics' control, CTS would be a more valuable company; then its shareholders would benefit from a takeover, hostile or otherwise. It is only human for CTS's officers and directors to doubt that a company which, if it takes control of CTS, will fire them can actually do a better job of running "their" company. But it is not their company; at least it is not supposed to be. It is supposed to be the shareholders' company, for it is they who are entitled to all the income that the company generates after paying off all contractually or otherwise obligated expenses. The officers and directors are the agents and fiduciaries of the shareholders and owe a duty of complete loyalty *which is inconsistent with erecting insuperable barriers to hostile takeovers.*

\*     \*     \*     \*     \*     \*

Personally we are rather skeptical about the arguments for defensive measures. They strike us as giving too little

weight to the effect of "defensive" measures in rendering shareholders defenseless against their own managements. (The shareholders of CTS were not asked to approve the poison pill.) (emphasis supplied).

We note, that the shareholders of Joy, likewise, were not asked to approve the poison pills adopted by its board. The *CTS Corp.* court went on to criticize the CTS poison pill, which was quite similar to the Joy Stock Rights plan (*see* p. 256), saying:

> We are especially skeptical about the arguments used to defend poison pills. If the present case is representative, the poison pill seems (as we shall see) more a reflex device of management determined to hold on to power at all cost than a considered measure for maximizing shareholder wealth.

*Id.* at 255.

The *CTS Corp.* case also noted that defensive measures, including poison pills, while within the power of a board of directors of a target corporation must be plausibly related to the goal of stockholder wealth maximization; *see also Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir.1986) (board of directors does not hold a blank check to use all possible strategies to resist even a takeover attempt which it believes is not in the best interest of the company); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1985).

We agree with intervenor that Berger had meritorious grounds for her attack on Joy's poison pills and that her complaint easily would have withstood a motion to dismiss. A number of the actions taken by the Joy board of directors from March, 1986, through December 15, 1986, including the adoption of the poison pills, could be found by a trier of fact to have been designed *primarily* to benefit and protect management and to discourage any competitive bidding for Joy. *See, Johnson v. Trueblood*, 629 F.2d 287 (3d Cir.1980). Therefore, there would be a sufficient factual question presented to entitle petitioner to proceed on the merits to prove that the anti-competitive measures adopted by Joy

management were in breach of its fiduciary duty to the shareholders because those measures were primarily designed to entrench management and operated to discourage the competitive bidding for the corporation which would have resulted, as it ultimately did, in an enhancement of the market value of the shareholders' interest in the corporation. Similar schemes have been enjoined by the courts. *See e.g., Edelman v. Fruehauf Corp.*, 798 F.2d 882 (6th Cir.1986).

The action taken by the management of Joy Manufacturing in March and May of 1986 in putting in place the poison pills that are the subject of this litigation was for the typical purpose of preventing a takeover by any entity except one approved by the board of directors of Joy (presumably on their terms and conditions). Counsel for Joy conceded as much at the hearing before this court on December 15. (Tr. p. 57).

From the chronology of events intervenor sets forth in her verified reply brief at pp. 11–21 which we adopt *infra* at p. 458, the trier of fact could conclude that the primary reason which motivated management to take the action which it did in March and May of 1986 was to protect itself by preventing the takeover of Joy by an entity hostile to management.

We are aware that there has been considerable debate and difference of opinion as to the benefit or harm to the corporation and its shareholders which results from the effect anti-takeover devices have on potential bidders and the effect these devices have of entrenching management, good or bad. As the Court noted in the *CTS Corp.* case, *supra* at p. 253, "[t]he whole issue of permissible defensive tactics in the face of a tender offer is immensely contentious...." *See CTS, supra,* at 253–256 for an excellent summary of this debate. The fact remains, however, that all of these devices are designed to and do prevent that open bidding for corporate stock which naturally enhances its value and which by its nature affords the shareholders not only the opportunity to sell their stock at the enhanced price if they choose to do so but also the opportunity to obtain a change in

corporate management, if that is their desire.

In addition, in determining whether or not the intervenor has stated a cause of action upon which relief can be granted, we consider the method by which the anti-takeover devices in this case were designed to operate. Mr. Alan Atwood, Vice President, Chief Financial Officer and Director of Joy, testified at his deposition that the purpose of the pension parachute was to discourage hostile takeovers by removing excess pension fund monies as a source of financing the takeover. The court believes, however, that the pension parachute could be found by a trier of fact to be a scorched earth plan which *when triggered* could not work to the benefit of the shareholders under any circumstance. Once the pension plan was activated by a so-called "Control Event," which under the plan included a hostile takeover *threat,* (*see* ¶ 7.C. of the plan cited in n. 2, *infra*), the board could create the "Termination Event" which would thereafter result in "excess" pension fund monies being distributed to the pensioners so as thus to be unavailable to the unfavored acquiring entity. But, of course, these pension fund monies were assets of the corporation and its shareholders, and when the pension plan was triggered, those funds not only became unavailable to the hostile takeover entity, but also for all time to their rightful owners, the Joy shareholders, who incidentally, never were given the opportunity to vote on the plan. Certainly, a judicial challenge to the validity of such a scheme and the stock rights plan, *see* p. 456, *supra*, would survive a Rule 12(b)(6) motion to dismiss.

### 2. *The Berger Suit Produced a Benefit to Joy and Its Shareholders*

■ Applying the standards adopted by the Third Circuit in the *Institutionalized Juveniles* and *Morrison v. Ayoob* case, *supra*, we find that the Berger intervention was a material factor in producing a benefit to Joy and its shareholders.

As indicated *supra*, the burden is on the defendant to prove that the Berger proposed intervention did not produce a benefit to Joy or its shareholders which would entitle petitioner to an award of fees and costs. We conclude that Joy failed to sustain this burden by finding, *a fortiori*, that petitioner has demonstrated the contrary.

The Eighth and Second Circuits have observed that "the chronological sequence of events is an important factor in determining whether or not it can be inferred that the defendants guided their action in response to plaintiff's lawsuit." *United Handicapped Federation v. Andre*, 622 F.2d 342, 347 (8th Cir.1980), cited with approval by the Second Circuit in *Koppel v. Wien*, 743 F.2d at 135 n. 3, wherein it also cited *City of Klawock v. Gustafson*, 585 F.2d 428 (9th Cir.1978), for the proposition that causation was inferred from a change in administrative policy which could not have been "spontaneous."

The court concludes that the *combined actions* of Pullman, in starting the hostile takeover ball rolling and remaining in the bidding as a hostile takeover threat, and of the petitioner, in presenting a viable judicial challenge to the validity of the anti-takeover measures and thus to render the hostile takeover a continuing possibility, operated to induce the management of Joy on or about December 15, 1986, to place the company on the market, and that this was a benefit to the corporation as well as to its tendering shareholders.

The relevant sequence of events in this case reveals a change of Joy's position in favor of a public auction after the appearance and participation of plaintiff intervenor, and, we believe, as a consequence thereof.

Up to the proposed intervention by Berger, Joy successfully had thwarted and frustrated Pullman's takeover efforts and had in hand two-year standstill agreements from A & S and a number of other potential bidders for Joy stock. (*See* Exhibit I—P, U, V of Joy's Response to the Petition for Counsel Fees). Petitioner's presence, however, constituted a continuing threat that regardless of the outcome of the Pullman counterclaims or its hostile tender offer the validity of the poison pills

would be adjudicated on the merits. (Tr. pp. 9–17). This constituted a substantial risk that the anti-takeover measures adopted by Joy would be declared invalid as a breach of the board's fiduciary duty to the shareholders and that Joy would be exposed to a takeover by hostile bidders. We believe that the evidence fairly indicates that this induced Joy's management to seek a friendly suitor—frequently referred to as a "white knight."

At pages 11–21 of petitioner's verified reply brief in support of its petition for attorneys' fees, petitioner sets forth the relevant chronicle of events from the adoption of the first poison pill in March of 1986, through the announcement and solicitation for bids on or immediately after December 15, 1986, and the subsequent acceptance of the A & S bid for $35.00 a share on December 22, 1986. The court adopts as accurate this account of events which is well-supported by the affidavits and documents submitted by the parties, including the minutes of the board of directors of Joy and various other documents filed by Joy. Petitioner argues from this that Berger's participation in this suit, at least in part, caused the sale of Joy on December 22, 1986, and the court agrees.

As late as Wednesday, December 10, 1986, Joy advised Pullman that Joy was not for sale. In a letter of December 10, 1986, from Joy to Pullman in which Joy forwarded its standstill agreement, the chairman, president and chief executive officer of Joy stated that, "You understand that the board of directors of Joy Manufacturing Company has not determined to sell Joy

and has directed management to explore various alternatives." (Exhibit E to Petitioner's Appendix). However, on, or immediately after, Monday, the 15th, Joy's management ceased to explore these "various alternatives" and announced that it was open for bids. This was just after Berger, with her standing to do so, announced her challenge to the validity of the poison pills on Friday, December 12, 1986, when she petitioned to intervene in this action, and the hearing thereon held by the court on Monday, December 15, 1986. Of course Joy's open invitation to bid meant that it would redeem the rights issued under the Rights Plan and that the pension parachute would not be triggered, because, as petitioner argues and the Joy board obviously intended, no rational buyer would attempt a purchase otherwise.[2] We believe that it is reasonable to conclude that this apparent change of heart was precipitated by the Berger petition to intervene.

Joy argues that all of the actions which it took *subsequent to the initial proposals made by Pullman* in September of 1986 were designed to find ways to enhance the value of Joy stock and were not defensive efforts to thwart the purchase of Joy by anybody. But the court concludes from the foregoing to the contrary.

As a component of its argument that the actions of the intervenor conferred no benefit on the corporation to justify an award of attorneys' fees against it, Joy contends that there was no benefit conferred upon the corporation, rather the benefit was conferred upon the shareholders and that the new owner of the corporation, A & S, actu-

**2.** As petitioner points out, and a review of the plans essentially substantiates,

Under Joy's pension parachute in the event of even the announcement of an unwelcome tender offer the pension parachute ... [could be triggered, thus entitling certain pensioners] to a windfall distribution of the excess funding in the pension plan, an asset of Joy that rightfully belonged to the shareholders. Under Joy's shareholder right's plan an unfriendly bidder would have to pay a prohibitive penalty if the bidder was successful in acquiring a substantial percentage of Joy's stock. For example, if the tender offeror acquired 30% or more of Joy's stock, all Joy's shareholders other than the *offeror* would

have the right to purchase for $75.00 Joy's stock with a market value of $150.00. Similarly, if a bidder acquired 20% or more of Joy's stock and then a merger was consummated, the poison pill gave all of Joy's stock shareholders the right to purchase $150.00 of the acquirer's stock for $75.00. No rational bidder could afford to consummate an offer on such terms. [Matter in brackets inserted to substitute for material in original which we believe could be misleading].

*See,* Plaintiff's Reply Brief, p. 16, n. 12; Plaintiff–in–Intervention's Appendix of Exhibits, Exhibit J generally, and especially at Appendix Page 0048 ¶ 7.C. and Exhibit K.

ally paid a higher price for its stock. We find this contention to be unpersuasive.

The very purpose of organizing a business corporation is to do business and to make a profit therefrom for the benefit of the owners of that business—the shareholders—and thereby to increase the value of their investment. The success or failure of a business corporation, therefore, largely is measured by the extent to which it has fulfilled its profit-making mission or is likely to do so. Corporate profit is reflected, *inter alia,* in dividends declared and in the appreciation of the *market value* of the shares of the stock held by the corporation's owners—its shareholders. It is reasonable to conclude, therefore, that an action benefits a *corporation* if that action enables the corporation better to do that for which it was created and has existence—to generate profit for its owners. If that profit comes from an appreciation in the market value of the corporate stock, then it seems fair to say that that which caused this appreciation conferred a benefit not only on the shareholders who have the opportunity to reap the immediate financial rewards but also upon the *corporation itself* by assisting it to fulfill its mission. Therefore, we need look no further for a direct benefit to Joy, the corporate entity, than to the combined actions of Pullman and the intervenor, which induced the Joy management to neutralize the anti-takeover measures it had adopted and to open the door to the competitive bidding for the company's stock which resulted in the dramatic increase in the value of the owners' interest in their corporation which occurred between December 1 and December 18–22, 1986.

The *Mills* "therapeutic effect" concept provides yet another reason to conclude that the action of Berger conferred a benefit on the corporation. Berger's proposed intervention provided an effective vehicle for a judicial determination of the validity of the anti-takeover measures adopted by the Joy board of directors. The officers and board of Joy never had given the shareholders an opportunity to vote up or down on either of the defensive measures adopted by the board. The board, thus,

preempted the most fundamental prerogative of the shareholders—the right to decide for themselves whether and at what price to sell their shares and the company. In *Koppel v. Wien,* 743 F.2d at 134–135, the court citing *Mills, supra,* stated that, "It is well established that non-monetary benefits, such as promoting fair and informed corporate suffrage ... may support a fee award."

Moreover, as indicated *supra,* it is difficult to see how the pension parachute, at least, if placed into effect possibly could benefit anyone other than the pensioners, by a substantial windfall, and the board, by discouraging hostile buyers. If triggered, the pension plan would divert corporate assets from the pension fund into the hands of a selected few. Pullman in its counterclaim estimates this to be 85 million based on Joy's 1985 Annual Report, *see* Pullman Answer and Counterclaim, p. 42, ¶ 181. These assets otherwise would be available for general corporate purposes, *see* Intervenor's Appendix of Exhibits, Exhibit J at Appendix p. 0045. While, as the court in the *CTS Corp.* case, *supra,* pointed out, there may be legitimate reasons for corporate management to obstruct some takeover attempts, management does not have *carte blanche* in choosing the means to do this. Preventing an unfavored acquirer from using the assets of the corporation to finance its purchase may in concept and under some circumstances be proper. But, it seems to us that the pension parachute in this case was designed to prevent this "misuse" of corporate funds by permitting a preemptive misuse by management.

We believe, therefore, that it was a therapeutic benefit to the corporation as contemplated by the Court in *Mills, supra,* to subject both poison pills to objective judicial scrutiny. This could be accomplished in an adversary context only by the intervenor since Pullman lacked standing to do so.

Finally, we believe that in principle there is little need under the facts of this case to define or identify specific benefits which enured to the corporation as distinguished

from its shareholders as a prerequisite to the assessment of attorneys' fees against the corporation. Here, we have a situation where all of the shareholders of the Joy Manufacturing Company opted to accept a tender offer of $35.00 a share for the Joy stock which they held on December 18–22, 1986. That stock which had closed on December 1, 1986, at $25.50 a share appreciated $9.50 in less than three weeks, a 37¼% increase which was a substantial benefit to the shareholders by any standard. If attorneys' fees were earned at all for conferring this benefit, and we firmly believe that they were, then they were earned as of the moment the benefit was conferred. This was on the day that the option to accept the $35.00 per share tender offer became available to the shareholders.[3] As of that date, the obligation to pay the attorneys' fees accrued, and as of that date the beneficiaries constituted 100% of the shareholders of Joy. Therefore, whether the attorneys' fees are taken directly from the shareholders or from an asset, the corporation, which they owned in direct proportion to the shares of stock which they held, should make little difference. In either event the cost will be passed through to them.

As we previously have pointed out, the fact that Pullman and Joy settled the case before it became necessary for the court to rule on the substantive issues shifted the burden to Joy to demonstrate that the Berger intervention was not a causal factor in the resolution of the disputes and the sale of Joy. *Barton v. Drummond Co., supra.* Joy has failed to discharge this burden in the view of the court. Against the chronology outlined above, Joy submitted affidavits and accompanying documents, which consist of the affidavits of officers and directors of Joy and of the Managing Director of Mergers and Acquisitions, First Boston Corporation, that the presence of Berger in this case or, indeed, the Pullman–Berger actions were not the cause of the marketing of Joy. The chronology and past and recent history of Joy and inferences drawn therefrom, as set forth in this

opinion, *supra*, weigh heavily to the contrary and outweigh those affidavits. *See Koppel v. Wien,* 743 F.2d at 132.

That the case settled before the court formally ruled that Berger could intervene does not preclude an award of attorneys' fees. *See Kahan v. Rosenstiel,* 424 F.2d at p. 167 n. 7. Although the court had not yet ruled, it had decided to permit the intervention because it had become clear to the court that Berger was not a mere opportunistic intermeddler but rather had a legitimate and significant role to play in this litigation. In addition, it was apparent to the court that Berger and the derivative class were well-represented. As it was, the court did permit Berger to intervene in all but name, and she did participate fully in the discovery and oral arguments and hearings that were had from the moment she petitioned to intervene in the case.

Accordingly, the court will enter an order awarding attorneys' fees and costs to petitioner, Cynthia Berger, and against Joy Manufacturing Corporation.

Petitioner's counsel have submitted a detailed fee petition which includes a brief and the affidavits of attorney Michael P. Malakoff and attorney Paul M. Bernstein substantiating the hours and expenses claimed. The court is prepared to make a specific fee award based on this petition. However, counsel for Joy requested at a conference on August 7, 1989, that it be given the opportunity to conduct some discovery in the event the court concluded that the fee petition should be granted. The court will permit discovery for a period of twenty days from the date of the order which will accompany this opinion. Joy will have ten days after the twenty-day discovery period to file a response and brief as to the amount of the fees and costs claimed by petitioner and petitioner will have ten days thereafter to reply. In the meantime, if counsel can agree on this *amount*, reserving to Joy the right to appeal from the court's decision to make the

---

3. It is immaterial to an award of attorney's fees whether beneficiaries claim or accept the bene-

fits obtained on their behalf. *Koppel v. Wien, supra,* 743 F.2d at 134.

award, they are urged and encouraged to do so.

An appropriate order will follow.

## ORDER OF COURT

AND NOW, this 1st day of December, 1989, for the reasons stated in the opinion filed this day, IT IS ORDERED that intervenor's petition for attorneys' fees be, and the same hereby is, granted; and,

IT IS FURTHER ORDERED that plaintiff shall have twenty days from the date of this order to complete discovery with respect to the attorneys' fees and within ten days after the completion of discovery to file a reply to this aspect of the petition and a brief; and,

IT IS FURTHER ORDERED that petitioner shall have ten days thereafter to file a response and brief.