Ben COOPERSTOCK, Daniel Lifshitz, Ara
c/o Steven Robinson, Barnett Stepak
and Gary Goldberg, Plaintiffs,

v.

PENNWALT CORPORATION,
et al., Defendants.

Civ. A. No. 88–9562.

United States District Court,
E.D. Pennsylvania.

April 22, 1993.

Stuart H. Savett, Barbara A. Podell, Kohn, Savett, Klein & Graf, P.C., Stanley R. Wolfe, Robert P. Frutkin, Berger & Montague, P.C., Philadelphia, PA, for plaintiffs.

Mary M. McKenzie, Matthew J. Broderick, John M. Coleman, Jennifer R. Clarke, Arleen Armstrong, Lawrence J. Goode, Geanne K. Zelkowitz, Dechert Price & Rhoads, Philadelphia, PA, for defendants.

## MEMORANDUM

GAWTHROP, District Judge.

Petitioners, Stuart H. Savett, Esquire and Stanley R. Wolfe, Esquire, have filed an application for attorneys' fees and reimbursement of expenses in the amount of $468,-650.27 and an order dismissing the action without prejudice as moot. The fee application stems from a derivative action brought by class action plaintiffs, former shareholders of Pennwalt Corporation ("Pennwalt"), requiring Pennwalt to negotiate with Centaur Partners, a hostile bidder for Pennwalt shares, or to take other steps to maximize shareholder value. Petitioners claim that as a result of pressure upon Pennwalt from plaintiffs' action and the one filed by Centaur Partners, Pennwalt found a "white knight," [1] thereby mooting plaintiffs' claims. Petitioners now seek compensation for their role in helping Pennwalt shareholders obtain the ultimate benefit which they received as a result of Pennwalt's merger with Societe Nationale Elf Aquitaine ("Elf").

Since it is undisputed that the action became moot by the merger between Pennwalt and Elf, I shall grant petitioners' motion to dismiss this action without prejudice. So also shall I grant the motion for attorneys' fees and expenses, upon the following reasoning.

## BACKGROUND

On December 12, 1988, Centaur Partners announced a hostile cash tender offer,[2] starting the next day, for all of Pennwalt's outstanding common stock, at a price of $100 per share.[3] Three days after the tender offer was announced, class plaintiffs filed this derivative action against Pennwalt and its directors, among others. In their complaint, Count I and II challenged the constitutionality of Sections 611 & 911 of the Pennsylvania

---

1. A "white knight" is a potential acquirer usually sought out by the target company of an unfriendly takeover to rescue it from the unwanted bidder's takeover.

2. The offer was conditioned on a determination either by the Pennwalt board of directors to redeem its shareholder rights plans, or a determination by a court that the rights plans were invalid.

3. Centaur increased the bid price to $110 per share on February 14, 1989.

Business Corporation Law ("PBCL") and the Pennsylvania Takeover Disclosure Law;[4] Count III sought to invalidate Pennwalt's shareholder rights plans (referred to as "poison pills");[5] and Count IV alleged that Pennwalt's directors breached their fiduciary duties by adopting and maintaining the poison pills and refusing to negotiate with Centaur or to take other steps to maximize shareholder value.

Simultaneous with the announcement of the tender offer, Centaur Partners and related entities (collectively referred to as "Centaur") filed an action against Pennwalt and its directors, among others, asserting, *inter alia,* similar claims as Pennwalt. In January 1989, Centaur solicited consents from the shareholders, demanding a special meeting for the purposes of removing the current board. In response, Pennwalt filed a motion for a temporary restraining order requesting, *inter alia,* an order temporarily enjoining Centaur from taking any steps to facilitate solicitation of Pennwalt's shareholders or from calling a special meeting of the shareholders. All parties, including class plaintiffs, appeared before this court. This court denied Pennwalt's motion on February 10, 1989, and allowed the special shareholders' meeting to proceed.

Pennwalt ultimately found a white knight, Elf, which acquired all of Pennwalt's outstanding common stock at $132-per-share. After the agreement between Pennwalt and Elf, petitioners attempted for some time to negotiate with Elf for the payment of their attorney fees. That did not bear fruit, which brings the matter before me.

### DISCUSSION

#### I. *Standard of Review for Attorneys' Fees*

■ While the "American Rule" requires that each party to a litigation bear its own legal fees and expenses, these fees may be awarded where the attorney has conferred a benefit on others through undertaking the risks and expense of bringing suit.

---

4. 70 P.S. §§ 71–85 (Purdon Supp.1988).

5. A "poison pill" is a defense tactic used by a company which is a target of an unwanted take-

*Mills v. Electric Auto–Life Company,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Kahn v. Rosenstiel,* 424 F.2d 161 (3d Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). This well recognized exception, known as the "common benefit" or "common fund" equitable doctrine, is premised upon the rationale that it would be unfair to require one party to bear the entire expense which results in the benefit to a large class of persons. *Boeing Co. v. Van Germert et al.,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). To prevent this inequitable result, a court may assess fees against the entire fund and thereby spread the litigation costs proportionally. *Id.* at 478, 100 S.Ct. at 749. The award of attorneys' fees is not limited to circumstances in which there is a monetary fund from which fees may be paid, but extends to any situation in which the litigation has "conferred a substantial benefit on the members of an ascertainable class." *Mills,* 396 U.S. at 393–394, 90 S.Ct. at 626; *Kahn,* 424 F.2d at 166.

■ Where defendant takes steps to moot a derivative action, plaintiffs should be awarded fees if: 1) the action was "meritorious" at the time of filing, 2) a substantial benefit was conferred to an ascertainable class, and 3) a causal connection existed between the action and the benefit. *See Mills,* 396 U.S. 375, 90 S.Ct. 616 (1970); *Kahn,* 424 F.2d at 167; *Joy Mfg. Corp. v. Pullman–Peabody Co.,* 729 F.Supp. 449, 454 (W.D.Pa. 1989). If plaintiff can demonstrate these two elements—merit and substantial benefit—the burden then shifts to the defendant to prove that the lawsuit did not in any way cause their action which ultimately rendered the suit moot. *Kahn,* 424 F.2d at 167. If the court finds that an applicant is entitled to fees and expenses, it must then determine what amount is fair and reasonable.

#### II. *Application of Law to This Case*

##### A. *Meritorious Claim*

■ A claim is "meritorious" for purposes of this inquiry

over to make its shares or financial condition less attractive to an acquirer.

if it can withstand a motion to dismiss on the pleadings if, at the same time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success. It is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable hope.

*Joy*, 729 F.Supp. at 454–455 (quoting *Chrysler Corporation v. Dann*, 43 Del.Ch. 252, 223 A.2d. 384, 387 (1966)). Thus, in establishing a meritorious claim, petitioners need only show that their claims had some reasonable hope for success based on the pleadings.

In the present case, I find that had the action not been rendered moot, Counts III and IV of plaintiff's complaint would have survived a motion to dismiss. In support of Counts III and IV, class plaintiffs assert that Pennwalt directors adopted the poison pills, without shareholder consent, for the purposes of securing themselves in office and empowering them to block tender offers or substantial stock accumulations, even those providing substantial benefits to Pennwalt shareholders. Defendant's answer amounts to a denial that Pennwalt directors unlawfully adopted and implemented these plans.

■ Measures taken by management as defenses against unwanted takeovers, such as the poison pills adopted by Pennwalt, are suspect and subject to close scrutiny. *Dynamics Corp. of America v. CTS Corp.*, 794 F.2d 250, 253–55 (7th Cir.1986), *rev'd on other grounds*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). Although such defensive measures are within the power of the board of directors of a target corporation, they must be plausibly related to the goal of stockholder wealth maximization. *Id.* In the present case, the shareholders of Pennwalt were not asked to approve the poison pills adopted by its board. Whether these poison pills, adopted in September 1987 and March 1988, were implemented primarily to benefit and protect management and to discourage any competitive bidding for Pennwalt is a question viable for a trier of fact, *see Johnson v. Trueblood*, 629 F.2d 287 (3d Cir. 1980), and, therefore, would survive a motion to dismiss.

■ Because I find that Counts III and IV would survive a Fed.R.Civ.P. 12(b)(6) motion to dismiss, I need not further inquire whether Counts I and II are meritorious. *Shields v. Murphy*, 116 F.R.D. 600, 605 (D.N.J.1987). For purposes of awarding attorneys' fees, Counts III and IV satisfy the "meritorious" requirement.

### B. *Benefit to the Corporation and its Shareholders*

Where a derivative suit has conferred substantial benefits to a corporation and its shareholders, plaintiff can recover attorneys' fees and expenses from the corporation. *Mills*, 396 U.S. at 391–95, 90 S.Ct. at 625–27. The "substantial benefit" requirement, has been interpreted broadly and has been held to include pecuniary as well as nonpecuniary gains. *Id.* at 394–396, 90 S.Ct. at 626–628; *See, e.g., Koppel v. Wien*, 743 F.2d 129 (2d Cir.1984) (seeking to prevent general partners from amending general participation agreement in a way that would have reduced participation rights held to be a substantial benefit); *Barton v. Drummond Co.*, 636 F.2d 978 (5th Cir.1981) (avoidance of unfair merger held to be a substantial benefit). Additionally, in cases analogous to the instant action, courts have awarded attorneys' fees where derivative plaintiffs accomplished the goals of their litigation through the defendant's mooting action. *Prudential–Bache Securities, Inc. v. Matthews*, 627 F.Supp. 622 (S.D.Tex.1986) (merger of the corporation rendered the derivative action moot); *Lewis v. Anderson*, 692 F.2d 1267 (9th Cir.1982) (court awarded attorneys fees and ruled that it was irrelevant that no determination on the merits had been made); *Altman v. Central of Georgia Railway Co.*, 540 F.2d 1105 (D.C.1976) (defendant mooted plaintiffs claims by reversing its position of withholding dividends).

Class plaintiffs ultimately received the relief they sought when Pennwalt merged with Elf, thereby mooting plaintiffs' claims and enabling Pennwalt shareholders to receive the highest cash price. As a result, Pennwalt shareholders received a substantial benefit, namely, a monetary fund measured by the difference between Elf's ultimate bid of

$132–per-share, rather than the $85–per-share offered by Pennwalt in its "Dutch Auction" [6] approximately five months earlier or the $110–per-share offered by Centaur multiplied by the approximately 6.8 million shares outstanding. This increase in Pennwalt stock was attributable to the merger with Elf. Thus, petitioners have sufficiently met the requirement that Pennwalt and its shareholders procured a substantial benefit.

## C. Causal Connection

The pivotal issue in this case is whether a causal relationship existed between plaintiffs' derivative action and Pennwalt's decision to merge with Elf. Where the stockholder's derivative suit has been rendered moot by subsequent action of the defendant the latter has the burden of showing that there was no causal connection between the two in order to defeat the stockholder's claim for legal fees and expenses. *Joy,* 729 F.Supp. at 454.

Having concluded that petitioners filed a meritorious suit and that the benefit sought by that suit followed, the burden shifts to Pennwalt to demonstrate that the lawsuit did not in any way cause them to take the action which ultimately rendered the suit moot. This shifted burden is, of course, not absolute. To rebut, Pennwalt must show that the benefit is attributable to other causes.

In *Morrison v. Ayoob,* 627 F.2d 669 (3d Cir.1980) (per curiam), the court discusses the standard to be applied in the Third Circuit for ascertaining a causal relationship: "[t]he action need not be the sole cause. Where there is more than one cause, the plaintiff is a prevailing party if the action was a material factor in bringing about the defendant's action." 627 F.2d at 671; *Joy,* 729 F.Supp. at 453–454; *see also Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 916 (3d Cir.1985).

Defendants admit they wanted to remain independent and would have done so if it had not been for the denial of its motion for preliminary injunction against Centaur. Defendants contend, however, that their decision to explore other options, and ultimately to merge with Elf, was not made as a result of plaintiffs' derivative action but was based on the conclusions by Edwin E. Tuttle, Pennwalt's Chairman of the Board and Chief Executive Officer, that Centaur was most likely to prevail in its efforts to acquire Pennwalt. *See Tuttle Affidavit* ¶ 4.

That Centaur and the class plaintiffs acted together in opposition to Pennwalt's motion for preliminary injunction, makes it difficult to separate the impact each of those opposing parties had on Pennwalt's decision. Nonetheless, plaintiffs' complaint was not merely a reiteration of Centaur's claims, but was a necessary precaution to protect the rights of Pennwalt's shareholders and to demand that Pennwalt and its directors take appropriate action to maximize shareholder value, including, but not limited to, negotiating with Centaur. Centaur was inherently incapable of performing these functions because of its potentially conflicting interest as a bidder for corporate control. It was thus appropriate that petitioners represent class plaintiffs separately, in the event the interests of Centaur and class plaintiffs diverged.

Petitioners rely on *In re MacMillan Inc. Shareholders Litigation,* 1989 WL 137936, 1989 Del.Ch. LEXIS 154 (1989), to support their proposition that even if the court finds that petitioners' role was only secondary, such a "monitoring" role is compensable when the litigation results in a substantial monetary fund benefiting the shareholder class. In *MacMillan,* the court found that although petitioners' in-court presentations virtually echoed those of the bidders for corporate control, and their discovery and other pre-hearing efforts were, by and large, similarly duplicative, petitioners' were entitled to an award of attorneys' fees for their monitoring role in protecting the shareholders' interest. The court held that "without appropriate counsel fee incentives, public shareholders of target corporations in situations of this kind might be left without advocates committed exclusively to their interests." *MacMillan,* 1989 WL 137936 at *4, 1989 Del.Ch. LEXIS 154 at *13. Therefore, under the authority of *MacMillan,* petitioners urge

---

**6.** A Dutch Auction is a "procedure whereby shares tendered for the lowest price are purchased first." *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 417 (8th Cir.1987).

that they are entitled to attorneys' fees for their significant role in this action.

Although Pennwalt has not totally rebutted the presumption against them, they have shown that the benefit conferred was attributable to Centaur's likely success in acquiring Pennwalt. However, I find that the joint actions of Centaur in initiating a hostile takeover threat, along with plaintiffs' action, presenting a genuine legal challenge to the validity of Pennwalt's anti-takeover measures, rendered the hostile takeover a continuing possibility, which eventually induced defendants to seek a white knight. Although Centaur's actions may well have been the critical and more persuasive factor in Pennwalt's decision to merge with Elf, I find that petitioners' services protected the shareholders' interest in the fund created by Centaur from the risk posed by Centaur's potentially conflicting interests. *See MacMillan,* 1989 WL 137936 at *4, 1989 Del.Ch. LEXIS 154 at *10–12. That such conflicts did not actually arise is immaterial, because the plaintiffs' interest in any monetary fund ultimately created was at risk. Thus, because the benefit need not be directly and entirely attributable to plaintiffs' lawsuit, I find that there was a sufficient causal connection between the benefit and plaintiffs' lawsuit to warrant an award of attorneys' fees. I thus turn to what fee is considered merited.

### III. *Reasonableness of Fees and Costs*

■ In determining what amount of attorneys' fees would be fair and reasonable, the court is faced with competing considerations. Allowances should be sufficiently liberal to compensate lawyers adequately so that use of the derivative action to police corporate management will be encouraged, but awards should not be so generous as to foster strike suits.[7]

■ "The award of fees under the equitable fund doctrine is analogous to an action in quantum meruit: the individual seeking compensation has, by his actions, benefited another and seeks payment for the value of the service performed." *Silberman v. Bogle,* 683 F.2d 62, 64 (3d Cir.1982) (quoting *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 165 (3d Cir.1973) ("*Lindy I*"). In cases where a common benefit exists, courts have awarded fees based on the lodestar method developed by the Third Circuit in *Lindy I* and *Lindy II. Prandini v. National Tea Co.,* 557 F.2d 1015 (3d Cir.1977); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir.1976) ("*Lindy II*"); *Merola v. Atlantic Richfield Co.,* 515 F.2d 165 (3d Cir.1975); *Lindy I, supra.* Yet where the benefit created was quantifiable, courts have awarded fees employing the percentage of recovery method. *See Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 271 (9th Cir.1989); *In re Smith–Kline Beckman Corp. Securities Litigation,* 751 F.Supp. 525 (E.D.Pa.1990); *Sala v. National Railroad Passenger Corp.,* 128 F.R.D. 210, 214 (E.D.Pa.1989).

In this case, I find the benefit conferred by class plaintiffs to be unquantifiable, for two reasons. First, as explained, class plaintiffs can only be partly credited with conferring the benefit achieved. Second, as in the *MacMillan* litigation, the class plaintiffs occupied only a monitoring role in the present litigation. Therefore, awarding a fee based on a percentage of the monetary fund would be inappropriate. However, because a fee should be awarded to reflect the fact that petitioners' efforts did benefit, albeit intangibly,[8] the shareholder class, I will evaluate the reasonableness of the fee requested under the lodestar method.

### A. *Lodestar Method*

■ The initial estimate of reasonable attorneys'. fees requires the court to first inquire into the hours spent by the attorneys on their services and then multiply those

---

7. A strike suit involves a shareholder derivative action begun with hope of winning large attorney fees or private settlements, and with no intention of benefiting the corporation on behalf of which the suit is theoretically brought.

8. Petitioners' contribution consisted primarily of maintaining a forceful presence for class plaintiffs to ensure that Pennwalt took the proper steps to maximize shareholder value. And forceful they most assuredly were.

hours by a reasonable hourly rate.[9] *Lindy II*, 540 F.2d at 113, 117–18; *Lindy I*, 487 F.2d at 167–68. The product of this multiplication is referred to as the "lodestar" amount and provides a reasonably objective basis for valuing an attorney's services. Once the lodestar has been established, the court may then adjust this figure with a "multiplier" to reflect the quality of the attorney's work, the benefit to the client, and the contingent nature of the litigation. *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 583–84 (3d Cir.1984); *Lindy II*, 540 F.2d at 113, 117–18; *Merola*, 515 F.2d at 168; *Lindy I*, 487 F.2d at 167–68.

■ The party seeking attorney fees has the burden to prove that its request is reasonable. *Rode v. Dellarciprete*, 892 F.2d 1177 (3d Cir.1990). To meet its burden, the fee petitioner must "submit evidence supporting the hours worked and rates claimed." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The application should provide the court with "fairly definite information as to the hours devoted to various general activities ... and the hours spent by various classes of attorneys." *Pawlak v. Greenawalt*, 713 F.2d 972, 978 (3d Cir.1983); *Lindy I*, 487 F.2d at 167. A fee petition meets the standard of specificity, set forth in *Lindy I*, if the district court can determine whether "the hours claimed are unreasonable for the work performed." *Rode*, 892 F.2d at 1190 (quoting *Pawlak*, 713 F.2d at 978).

■ Relying on this standard, I find petitioners' submissions to satisfy the specificity requirement. In support of their application, each of the nineteen petitioning plaintiffs' law firms submitted individual affidavits setting forth each attorney's hourly billing rate at the time of the litigation, the amount of time devoted by specific persons to particular activities, the lodestar value of this time, biographies of the firms and attorneys who worked on the litigation, and a breakdown of expenses incurred as of November 1989. In the course of drafting pleadings, conducting discovery, and negotiating settlement and the like, petitioning firms expended 2,053 hours of attorney and paralegal time [10] and arrived at a total of $436,128.75 for approximately fifteen months, from the inception of the case through November 1989.

Petitioners' concede, and I agree, that it would be inappropriate to increase the initial fee determination with a multiplier in this situation in light of the fact that they played a secondary role in this litigation and were not entirely responsible for the benefits produced. As it is within this court's discretion to grant attorney fees, I find that this amount constitutes a reasonable fee for the services rendered, and more than compensates for the inherent risks of representing class plaintiffs on a contingency basis.

Plaintiffs' counsel have also moved for reimbursement of $32,521.52 in expenses incurred from the inception of the lawsuit through November 30, 1989. These expenses include categories such as travel, long distance telephone, and computer services. After reviewing the law firms' supporting records and affidavits, the court finds that the amounts are adequately recorded and reasonable.

## IV. *Conclusion*

For the reasons stated, class plaintiffs are awarded attorneys fees totaling $436,128.75 and expenses totaling $32,521.52, to be taken from the fund established by Elf, the acquiring corporation of Pennwalt.

9. Absent extraordinary circumstances, an attorney's reasonable rate for fee awards is the market rate charged to private clients. *See Student Public Interest Research Group v. AT & T Bell Lab*, 842 F.2d 1436, 1442, 1445 (3d Cir.1988).

10. Plaintiffs' counsel does not include the time spent on preparation of the fee petition in their lodestar. *See Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d 1208, 1216, 1219 (3rd Cir.1978) (time spent on the fee petition may not be included in the lodestar for contingency or quality adjustments).