**In re THE PRUDENTIAL INSURANCE COMPANY OF AMERICA SALES PRACTICES LITIGATION**

Nos. MDL 1061, 95–4704.

United States District Court,
D.   New Jersey.

March 20, 1997.

See also 962 F.Supp. 450.

## OPINION

WOLIN, District Judge.

The Court here decides the petition for attorneys' fees and expenses jointly submitted by plaintiffs' counsel in the class action lawsuit (the "Class Action") against the Prudential Insurance Company of America ("Prudential"). All interested parties have had the opportunity to submit written arguments with respect to the fee petition, and on March 17, 1997, the Court held a public hearing (the "Fee Hearing") at which all interested parties were provided the opportunity to voice either their support or opposition to the fee petition.

At the heart of the Class Action complaint are allegations that, during the time period between 1982 and 1995, Prudential defrauded millions of policyholders by selling them life insurance products through improper sales tactics. In October 1996, plaintiffs and Prudential agreed on the terms of a proposed settlement of the Class Action (the "Settlement Agreement"). The Court recently reviewed and approved the Settlement Agreement as fair, adequate and reasonable. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450 (D.N.J.1997) (the "Fairness Opinion").[1]

## I. Introduction

Section K of the Settlement Agreement is entitled "Attorneys' Fees, Costs and Expenses." Pursuant to Section K, the parties agreed, subject to Court approval, that plaintiffs' counsel would make, and Prudential would not oppose, an application for an award of attorneys' fees and expenses not to exceed $90 million. Settlement Agreement ¶ K.1.[2] Under the Settlement Agreement, Prudential is responsible for paying the entire award; payment of the attorneys' fees and expenses will not directly or indirectly reduce, limit or modify the remedies provided to class members through the Alternative Dispute Resolution ("ADR") Process or Basic claim Relief ("BCR")—the two remedial options established under the Settlement Agreement.[3] *Id.* ¶¶ K.1, K.4.

Section K further provides that one-half of the fees awarded, plus all reasonable and documented expenses incurred as of the date of the Fairness Hearing (February 24, 1997), shall be paid within five business days after the Court files an Order approving the Settlement Agreement. *Id.* ¶ K.2. The parties, therefore, contemplated that once the Court approved the Settlement Agreement and the $90 million fee petition, Prudential would immediately pay to plaintiffs' counsel $45 million plus expenses. Section K provides that the balance of the attorneys' fees award becomes payable only after all appeals of the Fairness Opinion and fee decision have been adjudicated fully. *Id.* Finally, Section K provides that lead counsel for the class will be responsible for the allocation and distribution of the attorneys' fees among the various counsel representing plaintiffs. *Id.*

In accordance with Section K, plaintiffs' counsel submitted an application for $90 million on November 22, 1996 (the "Fee Petition").[4] As discussed more fully below, plain-

---

1. The Fairness Opinion sets forth in detail the background and history of the Class Action. The Court deems it unnecessary to reiterate here what has already been written. The Court will, instead, assume the reader's knowledge of the facts described in the Fairness Opinion.

2. Section K.1 states: "Lead Counsel agrees to make, and the Defendants agree not to oppose, an application for an award of Attorneys' Fees in the Centralized Proceeding not to exceed a total of $90 million (the 'Total Fees'). Additionally,

Class Members will not be required to pay any portion of the Attorneys' Fees."

3. For a full description of the remedial options, see the Fairness Opinion, Findings of Fact §§ IV.A, IV.B and IV.E.

4. On March 10, 1997, the Court denied an emergency motion brought by objector Richard Krell ("Krell") to strike the Fee Petition. *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, No. 95–cv–4704, slip op. (D.N.J. Mar. 10, 1997).

tiffs' counsel argue that the benefits created under the Settlement Agreement are analogous to a "common fund"[5] and that they are entitled to an award of fees and expenses based on a reasonable percentage of that fund.[6]

To establish the value of the benefits or "fund" created under the Settlement Agreement, from which a percentage award could be calculated, plaintiffs' counsel submitted with the Fee Petition the affidavit of Robert Hoyer, the Managing Partner of Arthur Andersen LLP's Life & Health Actuarial Services Group (the "Hoyer Affidavit"). In his affidavit, Hoyer values the settlement at $1.987 billion. Hoyer Aff. ¶ 19. Based on this valuation, the requested $90 million fee would equal 4.5% of the total fund.

Of the $1.987 billion, Hoyer attributes $863.7 million to the Task Force plan[7] and $1,123,300,000 to the enhancements built into the plan negotiated by plaintiffs' counsel. *Id.* ¶ 19. Moreover, Hoyer estimates the value of the BCR at $799.6 million and, based on a projected remediation rate of 3% (330,000 remediated claims), calculates the approximate value of the ADR Process at $1,187,400,000. *Id.* ¶¶ 6 11, 15.

Hoyer, however, points out that his valuations are estimates: "The ultimate remediation rate is a key assumption relative to the costs to Prudential of the ADR program. The extent and form of communications to the owners of the 10.7 million eligible policies will influence the actual results." *Id.* ¶ 13. Later in his affidavit, Hoyer again emphasizes that his valuations are largely based on projections: "The nature of these proceedings is unique and the opinions provided in this affidavit relate to future events which are not under the control of Arthur Andersen LLP and can be influenced not only by the involved parties, but also by external factors. As a result, all values shown in this affidavit should be considered approximations." *Id.* ¶ 18.

As contemplated by Section K of the Settlement Agreement, Prudential has not opposed plaintiffs' counsel's Fee Petition. *See* Fee Hr'g Tr. at 13. Additionally, no state's insurance commissioner has opposed the Fee Petition. A few class members, however, have filed objections to the Fee Petition.[8] The Court will discuss these objections, as necessary and relevant, throughout this Opinion.

In anticipation of the Fee Petition and in order to assist the Court in determining an appropriate award of attorneys' fees, the Court, by Order dated November 6, 1996, appointed an independent fee examiner, Stephen Greenberg (the "Fee Examiner"), to review the Fee Petition and to render a Report and Recommendation.[9] Pursuant to this Order, the Fee Examiner was given the authority to examine all materials he deemed pertinent to the Fee Petition The Fee Examiner filed his seventy page Report and Recommendation on February 13, 1997 (the "Fee Report").[10] Without delving into the reasoning of the Fee Report, the Fee Examiner concluded that the $90 million fee request is fair and reasonable and should be awarded to plaintiffs' counsel as contemplated under Sec-

---

5. A common fund is created "where a suit produces a recovery for persons other than the litigant or principal litigant." A. Hirsch & D. Sheehey, *Awarding Attorneys' Fees and Managing Fee Litigation* 49 (Fed. Judicial Ctr.1994) (*"FJC Fees"*).

6. In support of the Fee Petition, plaintiffs' counsel submitted the affidavit of Arlin Adams, who served as a judge on the Third Circuit Court of Appeals from 1969 to 1987 and whose reputation as a legal scholar is irreproachable.

7. The Task Force plan was a plan negotiated between Prudential and 44 state insurance departments. The Settlement Agreement encompasses and significantly adds to the Task Force plan.

8. In fact, plaintiffs' Co–Lead Counsel indicated that only thirty-nine of the roughly eight million class members objected to the Fee Petition. *See* Fee Hr'g Tr. at 5.

9. On February 11, 1997, the Court denied Krell's emergency motion to vacate this order on the basis that Krell had waived his right to object to the order. *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, No. 95–cv–4704, slip op. (D.N.J. Feb. 11, 1997).

10. The Court thanks Mr. Greenberg for his professional approach to this laborious task; his efforts are manifest from the quality of his Report and Recommendation.

tion K of the Settlement Agreement. Fee Report at 70.

■ Krell was the only objector to the Fee Report. As with the objections to the Fee Petition generally, the Court, as necessary, will discuss below Krell's objections to the Fee Report.[11]

For the reasons expressed below, the Court will deny the Fee Petition, as proposed, and will not adopt the Report and Recommendation of the Fee Examiner.[12] Instead, the Court will award plaintiffs' counsel a bifurcated attorneys' fee that will total no less than $45 million and no more than $90 million. The fee will be equal to the sum of (1) 11% of the value of Prudential's guaranteed minimum payout under the Settlement Agreement—$410 million, and (2) either (a) in the event that 330,000 election forms are filed requesting relief under the ADR program by June 1, 1997, $45 million (less expenses already paid) or (b) in the event the 330,000 ADR elections threshold is not satisfied, 5% of the total actual value of the settlement in excess of $410 million. As discussed below, this fee award reflects the structure of the Settlement Agreement and is fair and reasonable under the circumstances of this Class Action.

Finally, the Court will deny the fee petitions brought by the attorneys for objectors Treadway, Parnell and Ginsberg and for objector Beauvias.

## II. Judicial Review of Fee Requests / Legal Standards for Assessing a Fee

### A. General

■ A district court must thoroughly review the fee application in any class action settlement. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 819 (3d Cir.) (*"GM Trucks"*), *cert. denied*, —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). This is true even where the parties to the class action have agreed on an award of attorneys' fees because there exists the "danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees." *Id.* at 820 (quoting *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir.1991)). The self-interest of a defendant who is paying both the settlement amount and the attorneys' fees often fails to protect against this danger because "a defendant is interested only in disposing of the total claim asserted against it; ... the allo-

---

**11.** One objection bears mention here. Krell objects to the Fee Examiner's Fee Report, and moves to disqualify the Fee Examiner, on the basis that the Fee Examiner allegedly failed to comply with various procedural requirements mandated of special masters under Federal Rule of Civil Procedure 53. Primarily, Krell complains that the Fee Examiner acted *ex parte* and failed to apprise and to consult Krell's attorney with respect to examining the Fee Petition. The Court first notes that the November 6, 1996 Order does not reference Rule 53; in fact, as the Court noted at the Fee Hearing, the Court appointed Greenberg under Rule 54(d)(2)(D). While Rule 54(d)(2)(D) implicates Rule 53, the Court never envisioned Greenberg as a special master subject to the requirements of Rule 53. Indeed, the Court's authority to appoint a technical expert is deeply rooted in case law. *See, e.g., Danville Tobacco Ass'n v. Bryant–Buckner Assoc., Inc.*, 333 F.2d 202, 208 (4th Cir.1964) (stating that the term " 'Master' was a misnomer. In truth [the appointee] did not serve as a master.... [T]he Court chose him as an expert for its guidance."); *Scott v. Spanjer Bros., Inc.*, 298 F.2d 928, 930 (2d Cir.1962) ("Appellate courts no longer question the inherent power of a trial court to appoint an expert under proper circum-

stances, to aid it in the just disposition of a case.") (citing *Ex parte Peterson*, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920)). Nevertheless, even if Rule 53 were to apply, the Court has previously addressed Rule 53 arguments advanced by Krell with respect to the Fee Examiner. *See* Order and Opinion referenced *supra* n. 9. In that Opinion, the Court refused to adopt Frell's "hyper-technical argument" in favor of vacating the Order appointing the Fee Examiner. *Id.* at 10. Krell's arguments here are of the same ilk, and the Court again refuses to disqualify the Fee Examiner, who acted properly and professionally, for procedural reasons. Moreover, and perhaps most importantly, the Court has reviewed *de novo* the conclusions of the Fee Examiner. For the reasons discussed in this Opinion, the Court will not adopt the recommendation of the Fee Examiner. Krell's arguments that the Fee Examiner should be disqualified and that his report should be disregarded, therefore, are arguably inconsequential. For all these reasons, Krell's Motion to Disqualify the Fee Examiner will be denied.

**12.** The Court, however, acknowledges the usefulness of the Fee Report in drafting this Opinion.

cation between the class payment and the attorneys' fees is of little or no interest to the defense." *GM Trucks*, 55 F.3d at 820 (quoting *Prandini v. National Tea Co.*, 557 F.2d 1015, 1020 (3d Cir.1977)). Accordingly, the Third Circuit has warned that "the district court must be alert to the presence in the fee agreement of any actual abuse or appearance of abuse capable of creating a public misunderstanding." *Id.*

Here, the parties obviated the danger of an actual or apparent conflict of interest on the part of class counsel by negotiating in a manner expressly recommended by the Third Circuit in *Prandini* and by a Task Force appointed by the Third Circuit to report on the subject of court awarded attorneys' fees. *Court Awarded Attorneys' Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237 (Oct. 8, 1985).[13] In *Prandini*, the Third Circuit rejected a settlement agreement specifying the plaintiff's attorneys' fees. The Court held that class action counsel should not simultaneously negotiate both a settlement and attorneys' fees. *Prandini*, 557 F.2d at 1021.

The Third Circuit Task Force, however, recognized that the rule established in *Prandini* "may well tend to discourage settlement ... [by] mak[ing] it difficult for the defendant to ascertain precisely what its liability will be, thereby eliminating the very certainty that makes settlement attractive to the defendant." *Court Awarded Attorneys' Fees*, 108 F.R.D. at 267. Consequently, the Third Circuit Task Force recommended, among other approaches, the following:

[T]he defendant should be permitted to make an offer of settlement that is conditional on a subsequent satisfactory resolution of the question of fees. This type of offer, assuming the fee question is pursued in good faith, usually separates the issues of settlement of the merits and resolution of the fees in a way that should minimize the defendant's reluctance to negotiate. Once again, the theory and objectives of *Prandini* are preserved and its inhibiting side effects minimized.

*Id.* at 269.

The Third Circuit Task Force also suggested that, under certain circumstances, the Court may go so far as to lift the *Prandini* limitation and to allow the parties to negotiate simultaneously the settlement terms and the attorneys' fees: "The risk of liminal or even subliminal conflicts of interest arising seems to be extremely low when the parties approach the court and request a waiver of *Prandini* under the trial judge's supervision." *Id.*

The parties in this case followed the proper procedure. Plaintiffs' counsel and Prudential entered into fee negotiations only after the Settlement Agreement was otherwise negotiated (September 22, 1996) and this Court had authorized a discussion of the fee question (October 11, 1996). Weiss Aff. ¶¶ 129, 132, 225; Ashinoff Aff. ¶ 16. Under these circumstances, there is no reason to believe that Prudential's counsel—having already fixed the other terms of the Settlement Agreement and reserved Prudential's right to back out of the settlement absent satisfactory resolution of the fee issue—consented to the requested fee for any reason other than their belief in its reasonableness under all of the circumstances of this case.[14]

---

13. Interestingly, Krell's attorney, Michael Malakoff ("Malakoff"), was a member of this Task Force. He should, therefore, be intimately aware of the Task Force's conclusions.

14. Krell has repeatedly alleged that the fee negotiations occurred at the same time as the settlement negotiations and that, as a result, all negotiations are tainted. The Court has addressed this point on several occasions, most recently in the Fairness Opinion. *See* 962 F.Supp. at 482. Importantly, plaintiffs' Co–Lead Counsel, Melvyn Weiss, has sworn that fee negotiations occurred only after the settlement was negotiated. Weiss Aff. ¶¶ 129, 225; *cf. Court Awarded Attorneys'*

*Fees*, 108 F.R.D. at 267 (indicating that the court may "ascertain whether improper talks have taken place by requesting the information in a signed statement that would be subject to the sanction provisions of Federal Rules 7 and 11"). The Court has also previously discussed the fact that Krell has produced no sound evidence in support of his allegation. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, No. 95–cv–4704, slip op. at 5–6 (D.N.J. Feb. 18, 1997) (denying Krell's emergency motion to obtain discovery regarding attorneys' fees). While Krell seems intent on beating this dead horse, the Court will not again address this issue.

Regardless of Prudential's consent, however, the Court must proceed with its review of the Fee Petition and determine an appropriate award of attorneys' fees to be paid to plaintiffs' counsel.[15]

### B. Entitlement to Benefits

■ The amount of the award of attorneys' fees and expenses is controlled by the Court and is within its sound discretion.[16] *See GM Trucks*, 55 F.3d at 783, 821 (citing *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 115 (3d Cir.1976)). Determining an appropriate fee is "far from an exact science." *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 886 F.Supp. 445, 467 (E.D.Pa. 1995); *see id.* at 467–68 n. 46 (quoting *Matter of Superior Beverage/Glass Container*, 133 F.R.D. 119, 128 (N.D.Ill.1990)) ("The best short statement may be that an award should be reasonably arbitrary—meaning that there is no magic in the precise final numbers but that they must be reasonable, which is to say, the result of considered, articulated and fair judgments."). Accordingly, the amount of any fee must be determined upon the facts of each particular case.[17] *Id.* at 460 & n. 28 (quoting *Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 679, 692 (M.D.Ala.1988)); *id.* at 463 (quoting *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 775 (11th Cir.1991)); 1A Conte, *Attorney Fee Awards* 44 (1993) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and *Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676

(1980) ("The controlling standard for determining attorneys' fees is one of reasonableness under the circumstances of the particular case in light of the results or success obtained.... [Such determinations] are incapable of mathematical precision because of the intangible factors that must be resolved in the court's discretion.")).

### C. Method for Determining the Fee Award

■ Relevant law evidences two basic methods for evaluating the reasonableness of a particular attorneys' fee request—the lodestar approach and the percentage-of-recovery approach. Each has distinct attributes suiting it to particular types of cases. *See GM Trucks*, 55 F.3d at 821 (citing *Court Awarded Attorneys' Fees*, 108 F.R.D. at 250–53). In determining a fee award, the Court must first establish the type of action it is adjudicating and then primarily rely on the corresponding method of awarding fees. *See id.* While either the lodestar or percentage-of-recovery method should ordinarily serve as the primary basis for determining the fee, the Third Circuit has instructed that it is sensible to use the alternative method to double check the reasonableness of the fee. *See id.* at 820, 821.

Courts generally regard the lodestar method, which uses the number of hours reasonably expended as its starting point, as the appropriate method in statutory fee-shifting cases. *See id.* at 821. Because the lodestar award is de-coupled from the class recovery,

---

**15.** Krell argues that plaintiff's' counsel is not entitled to any attorneys' fees because the settlement confers no benefit on class members; Krell argues that the settlement merely shifts policyholders' equity from one pocket to the other. The Court disagrees. This settlement offers the eight million policyholder/class members the opportunity to have their claims fairly adjudicated and to be compensated for any wrongdoing. The settlement provides tangible benefits to the class members who come forward with claims. Plaintiffs' counsel, therefore, is entitled to attorneys' fees. The point may nevertheless be moot as Krell's attorney, Malakoff, conceded that an award of attorneys' fees is warranted here. *See* Fee Hr'g Tr. at 17–18 ("[B]ased on everything that I've seen, there's no question that lead counsel is entitled to a fee. They have created benefits.").

**16.** Various other objectors contend that no fee is warranted because the settlement only benefits the attorneys. *See* Objections of A. Nestor (Nov. 23, 1996); J. Azzinaro (Dec. 19, 1996); and B. Drillien (Nov. 28, 1996). The objections are without merit; as stated *supra* n. 15, the settlement benefits class members. Moreover, because Prudential will pay the attorneys' fees, class members' benefits are not reduced by the award of attorneys' fees.

**17.** At the Fee Hearing, plaintiffs' Co–Lead Counsel accurately opined that "this Court is in the best position to exercise informed discretions" in determining the amount of the fee award. Fee Hr'g Tr. at 6.

the lodestar assures counsel undertaking socially beneficial litigation an adequate fee regardless of the monetary value of the final relief obtained for the class. *See id.* The lodestar approach may also be used outside the pure statutory fee case where "the nature of the settlement evades the precise evaluation that is needed for the percentage-of-recovery method." *Id.* "On the other hand, the lodestar method has been criticized as giving class counsel the incentive to delay settlement in order to run up fees, while still failing to align the interests of the class and its counsel, and for not rewarding counsel incrementally for undertaking the risk of going to trial." *Id.* (citing John C. Coffee, Jr., *Understanding the Plaintiff's Attorney,* 86 Colum. L.Rev. 669, 691 (1986)).

The percentage-of-recovery method is used in common fund cases on the theory that the class would be unjustly enriched if it did not compensate the counsel responsible for generating the fund. *See id.* at 821 (citing *Court Awarded Attorneys' Fees,* 108 F.R.D. at 250). In the typical case, the Court should apportion the fund between the class and its counsel in a manner that rewards counsel for success and penalizes it for failure. *See id.* This method resembles a contingency fee in that it awards counsel a variable percentage of the amount recovered for the class. *See id.* at 819 & n. 38.

Notably, courts have relied on "common fund" principles and the inherent management powers of the court to award fees to lead counsel in cases that do not actually generate a common fund. *See id.* at 821; *see also FJC Fees* at 52 ("The requirement of a common fund, however, is not applied mechanically."). The rationale behind the percentage-of-recovery method also applies in situations where, as here, although the fee and settlement are separately negotiated and paid, both come from the same source—here, Prudential. *See GM Trucks,* 55 F.3d at 821. While the Third Circuit has expressed a pref-

erence for use of the percentage-of-recovery method in common fund cases, neither that Court nor the United States Supreme Court has held that use of that method is exclusive or mandated in such cases. *See id.* ("The ultimate choice of methodology will rest within the district court's sound discretion.").

■ Here, as in *GM Trucks,* the attorneys' fees sought are more closely aligned with the common fund paradigm than with the statutory fee paradigm; although the settlement and the attorneys' fees were separately negotiated and will be separately bestowed, Prudential will pay for both. *See id.* Moreover, as discussed below, a true common fund exists in this case in the form of the guaranteed minimum payout by Prudential. Accordingly, in assessing the requested fee, the Court will rely primarily upon the percentage-of-recovery method, and use the lodestar method solely as a cross-check.[18]

### III. Application of Percentage–of–Recovery Method

#### A. General

■ Under the percentage-of-recovery method, the Court must (1) value the settlement and (2) determine what percentage of that value should be awarded as attorneys' fees. *See id.* at 822. The Third Circuit has explained that in valuing the settlement the district court must "determine a precise valuation of the settlement on which to base its award." *Id.* Despite the apparent rigor of that requirement, the Third Circuit also said that "[a]t the very least, the district court ... needs to make *some reasonable assessment* of the settlement's value." *Id.* (emphasis added); *see also Weiss v. Mercedes–Benz of N. Am. Inc.,* 899 F.Supp. 1297, 1304 (D.N.J.) ("While precise calculations of such present value [of certificates awarded to class members in settlement of the action] are not possible, the Court believes that a *reasonable estimate* of a present market value of the

---

**18.** The Court, therefore, rejects Krell's argument that this case is not a common fund case, thereby requiring use of the lodestar method. *See* Krell's Objections to the Fee Examiner's Report and Recommendation at 12–14. The Court also rejects Krell's argument that public policy requires the Court to use the lodestar method because

Prudential is a mutual insurer. *See* Krell's Br. in Support of Motion to Allow Discovery on Lead Counsel's and Prudential's $90,000,000 Attorney Fee Agreement at 12. The cases cited by Krell are inapposite, and the Court finds no public policy which mandates use of the lodestar method here.

overall settlement is $75,000,000."), *aff'd,* 66 F.3d 314 (3d Cir.1995). Significantly, the Third Circuit's affirmance of *Mercedes–Benz* followed its opinion in *GM Trucks* by several months, and was decided by a panel which included Judge Becker, the author of the opinion in *GM Trucks.*

Just as the Third Circuit requires a finding of the value of the settlement, so it also requires the Court to specify the percentage it has applied to than value in determining the fee award. *See GM Trucks,* 55 F.3d at 822 ("At the very least, the district court . . . needs to make some reasonable assessment of the settlement's value *and determine the precise percentage represented by the attorneys' fee.*") (emphasis added). There is no consensus, however, on how to determine a reasonable percentage. *See Unisys,* 886 F.Supp. at 460; id. at n. 28, (citing *Mashburn,* 684 F.Supp. at 692 ("There is no general rule of what percentage of a common fund may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case.")). One court in this Circuit has observed that fee awards under the percentage-of-recovery method typically range from 19% to 45% of the settlement fund. *See In re SmithKline Beckman Corp. Sec. Litig.,* 751 F.Supp. 525, 533 (E.D.Pa.1990); *see also Unisys,* 886 F.Supp. at 461–62 (citing other cases and authorities referring to "typical" percentages or ranges of percentages awarded as attorneys' fees, to wit: 20–30%, 19–45%, 25%, 15–30%, 20–50%, 30%, and 20–35%).

In determining a reasonable percentage, courts have been guided by a variety of factors. For example, courts have considered what percentage might have been negotiated as a private contingent fee arrangement. *See Unisys,* 886 F.Supp. at 461 n. 32; *In re U.S. Bioscience Sec. Litig.,* 155 F.R.D. 116, 119 (E.D.Pa.1994); *Court Awarded Attorneys' Fees,* 108 F.R.D. at 256–57; *see also In re Continental Ill. Sec. Litig.,* 962 F.2d 566, 572 (7th Cir.1992) (Posner, J.) ("The object in awarding a reasonable attorney's fee . . . is to simulate the market. . . . The

class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client."); *Kirchoff v. Flynn,* 786 F.2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate' ") (emphasis in original); *In re RJR Nabisco, Inc. Sec. Litig.,* 1992 WL 210138, *7, 1992 U.S. Dist. LEXIS 12702, *20 (S.D.N.Y.) ("What should govern such awards [of attorneys' fees to class counsel] is not the essentially whimsical view of a judge, or even a panel of judges, as to how much is enough in a particular case, but what the market pays in similar cases."); *FJC Fees* at 65 ("The percentage method . . . helps ensure that the fee award will simulate the marketplace.").

Yet, because courts are reluctant to give fee awards markedly incommensurate with the efforts of the attorneys, percentage awards generally decrease as the amount of the recovery increases. *See Unisys,* 886 F.Supp. at 463; *Court Awarded Attorneys' Fees,* 108 F.R.D. at 256; *SmithKline,* 751 F.Supp. at 534. As noted in *In re First Fidelity Bancorporation Securities Litigation,* 750 F.Supp. 160 (D.N.J.1990), "[t]here is considerable merit to reducing the percentage as the size of the fund increases. In many instances the increase is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Id.* at 164 n. 1; *but see In re Shell Oil Refinery,* 155 F.R.D. 552, 573–74 (E.D.La.1993) (on a recovery of $170 million, the court awarded counsel fees comprising 17.92% of that recovery, excluding expenses, and comprising 26.88% including expenses).

On the other hand, the percentage awarded generally increases in line with increased quality of class counsels' service to the class. The quality factors considered by other courts have included the following: (1) the quality of the result achieved by class counsel in light of the difficulties faced;[19] (2) the

---

**19.** *See Unisys,* 886 F.Supp. at 479 ("In light of the risks of no recovery at all, the benefits provided by settlement are substantial."); *SmithKline,* 751 F.Supp. at 534 (despite "vexing fac-

tual and logistical difficulties," class counsel obtained "a highly favorable recovery"); *Meshel v. Nutri/System, Inc.,* 102 F.R.D. 135, 139 (E.D.Pa.1984) (where the total recovery possible

speed and efficiency of the recovery achieved by class counsel;[20] (3) the class counsel's standing, experience and expertise;[21] (4) the skill and professionalism with which class counsel prosecuted the case;[22] and (5) the quality and performance of opposing counsel.[23]

The Court notes, however, that the foregoing factors are not exhaustive;[24] as stated above, the appropriateness of a requested fee turns on the particular facts of each class action. *See Unisys*, 886 F.Supp. at 462–63 (quoting *Camden I Condominium Ass'n*, 946 F.2d at 775) ("In most instances, there will...[arise] factors unique to a particular case which will be relevant to the district court's consideration.").

## B. Valuation of Settlement

■ With respect to establishing the value of the settlement, the Court first notes that any fee awarded to class counsel in this case should be based upon the *entire value* of the settlement, including any portion which would have been provided to the class under the Task Force plan—a plan which resulted in substantial measure from the efforts of class counsel in this litigation. In awarding attorneys' fees, courts have recognized that they should consider not only those remedies conferred directly through the litigation process, but also those extra-judicial benefits to the plaintiffs which resulted from counsels' efforts in the litigation. *See, e.g., Institutionalized Juveniles v. Secretary of Pub. Welfare*, 758 F.2d 897, 916 (3rd Cir.1985); *Joy Mfg. Corp. v. Pullman–Peabody Co.*, 729 F.Supp. 449, 457 (W.D.Pa.1989); *see also FJC Fees* at 53–54 (discussing cases that evidence the breadth of this doctrine and stating, in particular, that "a common fund recovery is arguably available from a fund created by a legislative or administrative action spurred by the plaintiff's lawsuit") (citing *Winton v. Amos*, 255 U.S. 373, 393, 41 S.Ct. 342, 350, 65 L.Ed. 684 (1921)).

For instance, in *Institutionalized Juveniles*, plaintiffs' counsel was awarded attorneys' fees based solely on statutory and reg-

---

for 1,608 claimants was roughly $9.4 million, the Court found a settlement of $4 million to be excellent under the circumstances).

**20.** *See Unisys*, 886 F.Supp. at 479 (citing *Prandini*, 557 F.2d at 1019–20 (quality includes efficiency); *SmithKline*, 751 F.Supp. at 534; *cf. Court Awarded Attorneys' Fees*, 108 F.R.D. at 256 (noting that the fee awarded in a percentage of recovery case "could provide a percentage or fixed premium incentive based on how quickly or efficiently the matter was resolved").

**21.** *See Unisys*, 886 F.Supp. at 462 (citing *In re GNC Shareholder Litig.*, 668 F.Supp. 450, 452 (W.D.Pa.1987)); *SmithKline*, 751 F.Supp. at 534.

**22.** *See Unisys*, 886 F.Supp. at 479; *SmithKline*, 751 F.Supp. at 534.

**23.** *See Unisys*, 886 F.Supp. at 462, 479 n. 82 & accompanying text (citing *Trans World Airlines, Inc. v. Hughes*, 312 F.Supp. 478, 480, 483–84 (S.D.N.Y.1970)) (in determining fee, court considers the quality of the opposition as well as the standing of plaintiff's counsel), *aff'd as modified*, 449 F.2d 51 (2d Cir.1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

**24.** Some courts have held that the increased risk assumed by class counsel in undertaking the case may also warrant a percentage increase. The risk factors considered have included the following: (1) the extent to which class counsel's recovery of a fee was contingent on a successful outcome; (2) the likelihood of an unsuccessful outcome based upon the legal, factual and logistical hurdles faced by the plaintiff class; and (3) the amount of time and resources class counsel put at risk by undertaking the case. *See Unisys*, 886 F.Supp. at 478–79; *SmithKline*, 751 F.Supp. at 534; *Court Awarded Attorneys' Fees*, 108 F.R.D. at 256. The Supreme Court, however, held in *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), that risk enhancements were inappropriate in fee-shifting cases. While the Court did not address whether risk enhancements survive in common fund cases, the Court's reasoning for excluding risk enhancements in fee-shifting cases applies equally to common fund cases. *See Dague*, 505 U.S. at 566, 112 S.Ct. at 2643 ("Contingency enhancement would make the setting of fees more complex and arbitrary, hence more unpredictable, and hence more litigable."); *FJC Fees* at 70–71 (citing cases that have held that risk enhancements are inappropriate in common fund cases, but recognizing that courts differ on the issue); 3 *Newberg* § 14.03 (Supp. July 1996) (discussing cases where "courts have refused to extend *Dague* to common fund cases" and other cases where "courts have extended *Dague* to common fund cases"). While the Court views the issue of risk enhancements in common fund cases as unresolved, the Court will not consider risk enhancement factors in setting the appropriate percentage.

ulatory amendments which benefited the class, and for which the Court found that the litigation was a catalyst; the class received *no* remedies through the lawsuit itself. *See* 758 F.2d at 908, 910–17. The Third Circuit also specified that, to justify an award of attorneys' fees, the litigation need not be the sole cause of the extra-judicial benefit. *See id.* at 916 (in determining whether to award attorneys' fees, "a court should decide whether the litigation 'constituted a material contributing factor in bringing about the events that resulted in the obtaining of the desired relief. . . .' Thus, although the litigation must have been a 'catalyst for the implementation of all or any of the reform measures,' it need not have been the only catalyst.") (citations omitted); *accord Morrison v. Ayoob,* 627 F.2d 669, 671 (3rd Cir.1980) ("The action need not be the sole cause. Where there is more than one cause, the plaintiff is a prevailing party [entitled to attorneys' fees] if the action was a material factor in bringing about the defendant's action."), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981); *Joy Mfg.,* 729 F.Supp. at 457 (although there was no recovery in the litigation itself, counsel were entitled to fees because their actions in the litigation were "a material factor in producing the benefit to Joy and its shareholders").

Based on the record of this litigation, the Court concludes that plaintiffs' counsel, through this Class Action, were a material factor in bringing about the regulators' Task Force plan. For instance, the Task Force itself was formed in April 1995, at the urging of Prudential, only after several of the con-solidated lawsuits were begun and in response to the allegations made in those lawsuits. *See* Fee Report at 56; Weiss Aff. ¶ 27. Indeed, Prudential's counsel acknowledged the causal relationship between the lawsuits and the Task Force's formation and subsequent remediation plan. *See* Fee Report at 56. Further, the record shows that plaintiffs' counsel otherwise substantially contributed to the terms of the Task Force plan. Accordingly, any attorneys' fees awarded to class counsel should be based on the entire value of the proposed settlement. As such, the Court rejects Krell's argument that any valuation of the settlement on which a percentage is based should exclude any amount of the value attributable to the regulators' Task Force plan. *See* Krell Objections to the Fee Examiner's Report and Recommendation at 25; Krell's Br. in Support of Motion to Allow Discovery on Lead Counsel's and Prudential's $90,000,000 Attorney Fee Agreement at 16–17; Fee Hr'g Tr. at 17–20.

▄ With respect to establishing a precise value of the settlement, the Court notes that the only specific, comprehensive valuation of the settlement that is of record is that of plaintiffs' expert, Robert Hoyer.[25] Hoyer's valuations are set out above. While certain parties took issue with Hoyer's valuation methods,[26] no other party submitted a valid, competing valuation.

Equipped with only Hoyer's report, the Fee Examiner concluded that the value of the proposed settlement is within a range of $1.2–$2.0 billion. *See* Fee Report at 56. The

---

25. Prudential submitted the affidavit of Patricia Guinn of Tillinghast–Towers Perrin. Guinn estimates the cost to Prudential of the ADR program at $221 million per 110,000 policies remedied, but provides no estimate as to how many policies will be remedied. *See* App. to Def.'s Memorandum in Support of Class Action Settlement, Vol. III, Ex. 26. Prudential also submitted the affidavit of Daniel McCarthy of Milliman & Robertson, Inc., who estimated the value of the BCR to be $425 million, but whose analysis also included a range of BCR values from $272 million to $686 million. McCarthy Aff. ¶ 5. McCarthy's conservative BCR valuation of $272 million is the lowest BCR valuation of record. *Compare* Hoyer's BCR valuation of $799.6 million discussed *supra.* The BCR cost estimates and valuations generally have gone uncontested in this litigation.

26. The primary objections to Hoyer's report were filed by the Florida Attorney General (the "Florida AG") and Krell. The Florida AG objected to Hoyer's report based on a report of its own valuation consultant, Steven Oscher ("Oscher"). In light of Florida's withdrawal of its objections, the Court will not delve into a discussion of Oscher's report. It suffices to say that the Court has considered Oscher's report and Hoyer's reply to that report. For purposes of this Opinion, the Court is comfortable with treating Hoyer's report as the only credible comprehensive valuation, subject to the limitations of that report discussed below. Similarly, because the Court finds Krell's objection to be based on flawed interpretations of the Settlement Agreement, the Court does not find merit in Krell's objections to Hoyer's report. *See* Hoyer Reply Aff. ¶¶ 24–27.

Fee Examiner calculated this figure based on Hoyer's $799.6 million estimated value of the BCR under the Settlement Agreement, plus the $410 million minimum guarantee Prudential has agreed to pay even if no claims are processed under the Settlement Agreement's/ ADR Process. *See id.; cf.* Def.'s Memorandum in Support of Class Action Settlement at 49 n. 15 (The total cost of the settlement, exclusive of the value of the BCR, "will be a minimum of $410 million and can exceed $1 billion."). The Fee Examiner further noted that the minimum value of $1.2 billion and Hoyer's valuation of $1.987 billion exclude the value to the class of having the requested attorneys' fee of $90 million paid directly by Prudential. *See* Fee Report at 57. Accordingly, the Fee Examiner determined that, on the available record, the range of reasonable valuations of the settlement is from a minimum value of $1,299,600,000, ($1,209,600,000 + $90 million fee award) to a value in excess of $2.077 billion ($1.987 billion + $90 million) *depending, primarily, on the number of class members who take advantage of the proposed settlement's ADR Process.*[27] *See* Fee Report at 56–57 (emphasis added). The Fee Examiner therefore concluded that the Court could value the settlement anywhere within a range of roughly $800 million.

The Court is mindful of the Third Circuit requirement that this Court must arrive at a settlement value as a predicate to the award of attorneys' fees under the percentage-of-recovery method. *See GM Trucks,* 55 F.3d at 822. Here, however, the Court is faced with a Settlement Agreement that provides for a "future fund" that is uncapped and the total true value of which is dependent upon the number of class members that come forward to have their claims remediated under the ADR program. *See* Hoyer Aff. ¶ 13; Fee Report at 56–57. Thus, the Court views this case as an atypical common fund case.

The Court is also aware that, for purposes of awarding attorneys' fees, it must simply make "some reasonable assessment of the settlement's value." *GM Trucks,* 55 F.3d at 822; *see also Mercedes–Benz,* 899 F.Supp. at 1304. The Court, however, questions the reasonableness of any valuation that may differ by as much as $800 million, which when viewed on the valuation spectrum in this case, constitutes a 67% variable ($1.2 billion to $2.0 billion). The nature of the Settlement Agreement simply does not lend itself to a reasonable valuation at this time.

Plaintiffs' counsel would presumably counter this argument by citing to Hoyer's report and claiming that to characterize the valuation as tenuous is to improvidently disregard the only comprehensive expert valuation available. Indeed, the Court is aware of the important role that experts play in the judicial process and that:, faced with a credible expert report, Courts should not hesitate to rely on the conclusions therein. Here, however, Hoyer explicitly warns that his valuations are based on a remediation rate that is, at most, a best-guess estimate. *See* Hoyer Aff. ¶¶ 13, 18. Moreover, Foyer emphasizes the unique nature of these proceedings. *See id.* ¶ 18. Presumably, then, there can be no reliable model for estimating the number of claimants who will take advantage of the remediation available under the Settlement Agreement. While the Court has no doubt as to Hoyer's good faith, professional estimate, the Court recognizes, as does Hoyer, that the estimate is tentative.

Armed with the authority to mensurate the number of claims that will be remediated and to establish the value of the settlement within a range of $800 million (or more), one could argue the reasonableness of almost any valuation and, thus, any award of attorneys' fees. For the Court to endeavor in such a task would be akin to a one-eyed archer judging the distance to the bull's-eye. The Court, therefore, determines that the settlement at this time cannot reasonably be valuated.[28]

27. These figures exclude Prudential's costs of providing notice and Prudential's costs of administering the ADR process under the Settlement Agreement. Plaintiffs estimate the cost of providing notice at $50 million and the cost of administering the ADR Process at in excess of $100 million. *See* Weiss Aff. ¶¶ 11 n. 2, 196;

Pls.' Memorandum of Law in Support of Joint Petition for Attorneys' Fees and Expenses at 41 n. 10.

28. The Court notes that it is the unique circumstances of *this* settlement that preclude a reasonable valuation: *e.g.,* the settlement value is

■ For this reason, the Court has considered turning to the lodestar method to determine an appropriate attorneys' fee. *See GM Trucks*, 55 F.3d at 821. On a theoretical level, however, the primary purpose of the lodestar method—"to ensure the procurement of competent counsel for certain kinds of cases"—is not applicable here. *See FJC Fees* at 65. Moreover, this case involves over 25 law firms, more than 250 lawyers and paralegals, and as of January 31, 1997, a lodestar of over $17 million.[29] On a practical level, to travel down the long road of reviewing the lodestar in this case would be a draining, inefficient use of the Court's resources. *See, e.g., Prandini v. National Tea Co.*, 80 F.R.D. 447, 448–49 (W.D.Pa.1978) (refusing to attempt a detailed lodestar analysis because "the judicial time consumed in such an attempt would be highly unjustifiable"); *Court Awarded Attorneys' Fees*, 108 F.R.D. at 246–49 (identifying nine separate problems with the lodestar method and characterizing the lodestar method as a "cumbersome, enervating, and often surrealistic process of preparing and evaluating fee petitions that now plagues the Bench and Bar").

More importantly, however, the Court deems it unnecessary to abandon the percentage-of-recovery method in this case.

The Court's charge is to determine a fair and reasonable attorneys' fee. The Court believes that such a result is best achieved in the present case through a modified application of the percentage-of-recovery approach that establishes a percentage of recovery on the known value of the settlement—Prudential's guaranteed minimum payout of $410 million (the "Minimum Fund")—and a separate percentage of recovery with respect to the future, additional value of benefits to be paid to class members who come forward under the Settlement Agreement (the "Future Fund").[30]

## C. Determining the Appropriate Percentage

■ "Courts have traditionally determined the amount of common fund fee awards by considering several factors, especially the size of the fund, and frequently have based awards on what they consider a reasonable percentage of the fund." *FJC Fees* at 63. In assessing the appropriate percentage with respect to the Minimum Fund and the Future Fund, the Court will consider the following factors: (1) the extent to which the percentage should reflect the size of the recovery; (2) the fee percentages

uncapped; the class has 8 million members (potential claimants) and the true value of the settlement is virtually unpredictable because the value depends heavily upon the success of the outreach program and the number of class members who file a claim under the ADR program. Importantly, the Court does not conclude that a reasonable value would be indeterminable in every "future fund" case, including any subsequent case which is settled under a structure similar to that existing here. Moreover, this base differs from other cases where a finite fund is established and the true cost of the settlement to defendant is based on how many class members come forward to claim part of the already established fund. *See, e.g., Mercedes-Benz*, 899 F.Supp. at 1304. Under such circumstances, the Court could establish a reasonable value of the settlement using the total value of the available fund. *See id.*

**29.** Significant events occurred after January 31, 1997 (namely, the Fairness Hearing on February 24, 1997), which are not reflected in the lodestar cited here. Additionally, under the Settlement Agreement, class counsel will have significant continuing responsibilities for overseeing certain administrative aspects of the ADR process. Thus, this lodestar is understated and would have

to be updated and detailed were the Court to engage in a full lodestar analysis.

**30.** As discussed below in this Opinion, as an alternative to this percentage award made with respect to the Future Fund, attorneys' fees of $45 million will be awarded if the number of election forms filed requesting ADR by June 1, 1997, total at least 330,000.

With respect to the Future Fund percentage award, the Court notes that the concept of awarding attorneys' fees based on a fixed percentage of a future fund is not unprecedented. *See Bowling v. Pfizer, Inc.*, 922 F.Supp. 1261 (S.D.Ohio) (awarding attorneys' fees equal to 10% of current fund of $102.5 million and up to 10% of future payments defendant was required to make under settlement agreement), *aff'd*, 102 F.3d 777 (6th Cir.1996); *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1010, 1018–19 (5th Cir.1977) (noting that district court awarded attorneys' fees equal to 8% of "what was then and is now an unknown amount of total damages recovered" and stating that "[i]n the present case there is not a fund in the sense of identified items already in the hands of a court appointee, but this is not a necessity.").

awarded in other class actions in which the recoveries exceeded $100 million; (3) the factors reflecting the quality of class counsel's service to the class; (4) the fee percentage that would have been negotiated in this case were it the subject of a private contingent fee agreement negotiated at the time of engagement; and (5) a cross-check against the lodestar of the conclusions reached under the percentage-of-recovery method.

### 1. Effect of the Size of the Recovery

The size of the recovery is a factor for consideration in establishing the percentage of recovery. *See SmithKline,* 751 F.Supp. at 534 ("the percentage of recovery fee should decrease as the size of the common fund increases"). Some courts have implemented a sliding scale, "allowing recovery of a given percentage of a certain amount of the fund, and decreasing percentages of subsequent amounts." *FJC Fees* at 69 (citing *In re Fidelity Bancorp. Sec. Litig.,* 750 F.Supp. 160, 163 (D.N.J.1990) (awarding 30% of the first $10 million, 20% of the next $10 million and 10% of any recovery beyond $20 million)). Consequently, although courts have identified the appropriate percentage range in common fund cases; as anywhere from 20–30%, some reduction is appropriate in this case where the recovery will equal at least $410 million. *Compare In re U.S. Bioscience Sec. Litig.,* 155 F.R.D. 116, 120 (E.D.Pa.1994) (awarding fees of 30% of the settlement amount) and *SmithKline,* 751 F.Supp. at 531–34 (awarding as fees 25% of the recovery, and noting that "Courts have allowed attorney compensation ranging from 19 to 45% of the settlement fund created") *with* cases cited immediately *infra* (discussing attorneys' fee awards in class actions with settlement funds of at least $100 million).

### 2. Percentages Awarded in Other Class Actions with Recoveries of $100 Million or More

A review of fee awards to class counsel in cases where the recovery was $100 million or more reveals a range of percentages from 4.1% to 17.92%, excluding from the award any reimbursement of expenses. *See, e.g., In re Baldwin–United Corp. Litig.,* 1986 WL 12195 (S.D.N.Y.1986) ($183.8 million settlement fund; 4.1% fee award); *In re Washington Public Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1297, 1301 (9th Cir.1994) ($687 million settlement fund; 4.658% fee award reversed and remanded because district court abused its discretion in *refusing* to award a risk multiplier; court indicated that a greater award was appropriate); *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1296 (E.D.N.Y.1985) ($180 million settlement fund; 5.5% fee awarded); *In re Folding Carton Antitrust Litig.,* 84 F.R.D. 245 (N.D.Ill.1979) ($200 million settlement fund; 6.6% fee award); *In re MGM Grand Hotel Fire Litig.,* 660 F.Supp. 522 (D.Nev. 1987) ($205 million settlement fund; 7% fee award); *Bowling,* 922 F.Supp. at 1283–84 ($102.5 million settlement fund; 10% fee award plus separate award of up to 10% of all future contributions to settlement fund); *Sioux Nation of Indians v. United States,* 227 Ct.Cl. 404, 650 F.2d 244, 247 (1981) ($106 million settlement fund; 10% fee award); *Stender v. Lucky Stores, Inc.,* No. 88–cv– 1467 (N.D.Cal. Apr. 20, 1994) ($107 million settlement; fees *and costs* consumed 12.8% of recovery) (reported in 18 *Class Action Reports* 338 (May–June 1995)); *In re Shell Oil Refinery,* 155 F.R.D. 552 (E.D.La.1993) ($170 million settlement fund; 17.92% fee award).[31]

### 3. The Quality of Counsels' Performance

As discussed more thoroughly in the Fairness Opinion, the results achieved by plaintiffs' counsel in this case in the face of significant legal, factual arid logistical obstacles and formidable opposing counsel, are nothing

---

**31.** Krell argues that it is inappropriate to consider this sampling of cases because the settlement in this Class Action has a value greater than in the cases cited. *See* Krell Objections to Fee Examiner's Report and Recommendation at 25. The Court disagrees; the cases cited involve enormous settlements and, as such, provide guidance to the Court as to what constitutes a reasonable award of attorneys' fees in this Class Action. The cases cited are but one factor the Court has considered in determining an appropriate award here.

short of remarkable.[32] While the Fairness Opinion details the facts underlying the quality of representation and the obstacles of prosecution, *see, e.g.,* Fairness Opinion, Findings of Fact § III, several points bear mention here:

First, the Settlement Agreement contains many innovative features highly beneficial to members of this class, namely: (1) the availability of full compensatory, as well as extra-compensatory, relief; (2) the minimum guarantee of $410 million and the absence of any cap on the total amount Prudential must pay to remediate claims; and (3) an aggressive "outreach" program designed to inform class members of their rights under the Settlement Agreement so as to achieve the maximum participation rate possible. *See id* § IV (describing terms of settlement). Of even greater significance are the procedural checks and incentives aimed at ensuring that class members, claims under the ADR program are scored fairly. While Prudential employees score class members' claims at the first and third tiers of the four-tiered review process, the reviewers at the second and fourth tiers are completely unaffiliated with Prudential and are selected by class counsel and the regulators. *See id.* §§ IV.A and IV.E.1. Through the review process, class members are assured a fair evaluation of their claims. Moreover, because Prudential is responsible for the costs associated with the administration of the ADR program, there exists a financial disincentive for Prudential's reviewers to award unfairly low scores at the first and third tiers.

Second, the extraordinary quality of the settlement achieved by class counsel is also confirmed not only by the approval of its terms by the insurance regulators of every state and the District of Columbia, but by its clear and substantial improvements over the Task Force plan which 44 of those regulators carefully crafted and considered adequate. *See id.* 99 III.B, III.I and IV.E.

Third, as concluded in the Fairness Opinion, the Settlement Agreement is fair, reasonable and adequate. While certain class members have objected to various aspects of the Settlement Agreement,[33] these objectors fail to consider that the settlement is just that—a settlement. In reaching a settlement, compromises must be made that render, possibly not the ideal result, but at the very least a fair one. By settling the case, plaintiffs' counsel efficiently avoided several potential risks of non-recovery including outright dismissal on technical legal grounds, such as statute of limitations, parol evidence, etc.[34]

Finally, the standing and professional skill of plaintiffs' counsel, in particular Co–Lead Counsel, is high and undoubtedly furthered their ability to negotiate a valuable settlement and argue its merits before this Court. Several members of plaintiffs' counsel are leading attorneys in the area of class action litigation. Similarly, defendant's counsel's standing and skill are very high.

All of these factors reflect the quality of plaintiffs' counsel's service to the class and support the fee requested.

### 4. The Fee Percentage that Would Have Been Negotiated Were this Case the Subject of a Private Contingent Fee Agreement

The Fee Examiner concluded that:

claims without prejudice, but expressed "considerable doubt as to [the] ultimate merits" even of those claims which it did not dismiss. *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* No. 95–cv–4704, slip op. at 2 (D.N.J. May 10, 1996, as amended June 10, 1996). Further, while plaintiffs have attempted to plead around these legal impediments in their Second Amended Complaint, Prudential argues that, were this litigation to proceed, plaintiffs by no means would be out of the woods. *See* Def.'s Memorandum in Support of Class Action Settlement at/50–64.

---

**32.** Krell and other objectors contend that plaintiffs' counsel has failed to adequately represent the class. *See* Krell's Br. in Support of Motion to Allow Discover on Lead Counsel's and Prudential's $90,000,000 Attorney Fee Agreement at 14–15; Objections of A. Infanti (Dec. 5, 1996) and L. Piro (Dec. 19, 1996). The record indicates otherwise. *See* Fairness Opinion, Conclusions of Law § IV.4.

**33.** *See, e.g.,* Krell's Objections to Fairness, Reasonableness and Adequacy of Proposed Settlement and Award of Attorneys' Fee and Expenses.

**34.** The objectors should be reminded that, in partially granting Prudential's motion to dismiss, the Court not only dismissed several of plaintiffs'

given the extraordinary burdens and challenges of prosecuting this action on behalf of plaintiffs, the concomitant risks assumed by class counsel in undertaking this representation on a purely contingent basis, and the stellar reputations and expertise of class counsel, were this case the subject of a private contingent fee agreement at the time of engagement, class counsel might well have demanded and received a contingent fee agreement whereby they would receive upward of 20%, and even as high as 40%, of any future recovery in exchange for shouldering the enormous expenses and risks they faced at the outset of this case.... Of course, one is tempted to take the result and reason backward as to what contingent fee would have been negotiated. But that is not how *contingent* fees are arrived at in reality. At the time such fees are agreed upon, not only the sum of the recovery, but whether or not there will be any recovery, is unknowable.

Fee Report at 60.

The Fee Examiner also noted a famous precedent—the attorneys' fee paid to plaintiff's trial counsel in the litigation between Pennzoil and Texaco—and concluded that "the class counsel in this case would have demanded and received a contingent fee percent of *at least* 10 to 15%." [35] Fee Report at 61.

While the Court does not give great weight to this hypothetical exercise, the Court agrees with the Fee Examiner that "there is no reason to doubt that, given the obvious risks and burdens required for its prosecution, lawyers of plaintiffs' counsels' standing would have negotiated a fee of at least 10 to 15% of the recovery." Fee Report at 61.

### D. Conclusions as to the Appropriate Percentage

■ The Fee Examiner concluded that, "at the low end of the range of reasonable

valuations of the settlement in this case—$1,299,600,000—the appropriate percentage for an award of attorneys' fees is 8.0%, resulting in a fee of $103,968,000, excluding expenses; and that at the high end of that range—$2,077,000,000—the appropriate percentage is 7.0% (decreased somewhat from 8.0% to reflect the higher value of the recovery), resulting in a fee of $145,390,000, excluding expenses. Under either valuation, the requested award—$90 million to cover fees *and expenses*—is within the ambit of these permissible percentages." Fee Report at 67–68. While the Fee Examiner's report is well written and reasoned, the Court will not adopt his recommendation because it does not adequately account for the uncertainty of the expert projections of the settlement's value.

Instead, the Court will grant a bifurcated award of attorneys' fees—one amount for the Minimum Fund and one amount for the Future Fund. As discussed *supra,* the Court believes that the $410 million minimum guaranteed payment is the only hard valuation that currently exists; no valuation of the Future Fund or entire settlement would be sustainable at this time because no one can reasonably predict the participation rate under the ADR program.

### 1. The Minimum Fund

The Court will award plaintiffs' counsel 11% of the Minimum Fund as the first part of their award of attorneys' fees. The Court determines 11% to be a fair and reasonable percentage with respect to the guaranteed minimum in this Class Action. While the Court views a 11% award as at the high end of the range of appropriate percentages for a recovery of this magnitude, the Court believes, for the reasons discussed herein, that this award is justified, at least with respect

---

**35.** "Although the ultimate recovery in the Pennzoil litigation was some $3 billion—greater by approximately half than the valuation plaintiffs themselves place on the settlement in this case—the plaintiff's counsel received, pursuant to a privately negotiated agreement, a contingent fee estimated at $420 million, or *14%.*" Fee Report at 61 (citing Andrew Blum, *The Rich List,* Nat'l

L.J., Oct. 26, 1992, at 2; The 1994 Power List—An Overview of the Outstanding Members of the Legal Profession, Nat'l L.J., Apr. 4, 1994, at C4). Notably, however, the $3 billion settlement occurred after plaintiffs won a $10 billion verdict at trial, and the fee was awarded post-trial and settlement.

to the Minimum Fund.[36] Thus, the Court will order Prudential to pay to plaintiffs' Co-Lead Counsel, within five business days of this Opinion, an amount of $45 million, plus all reasonable and documented expenses incurred through the date of the Fee Hearing on March 17, 1997.[37]

### 2. The Future Fund Attorneys' Fee

As discussed above, the Court does not believe it can currently establish the reasonable value of the Future Fund because the number of claims that will be remediated under the APR program is unknown. As a result, the second part of the attorneys' fee award will be determined under two alternative methods, both of which may fairly be viewed as contingent upon the success of the outreach program.

#### (a) Automatic Award of $45 Million

First, if at least 330,000 election forms are filed electing the APR program by June 1, 1979 (the "Claims Threshold"), the Court concludes that the outreach program will have been successful and that plaintiffs' counsel will be entitled to an award of attorneys' fees equal to $45 million (less the expenses assessed above), to be paid to Co-Lead Counsel by Prudential within five business days after the settlement becomes final (*i.e.*, all appeals of the settlement are adjudicated). Under the terms of the Settlement Agreement, if 330,000 claims are remediated under the ADR program, Prudential must pay a minimum of $1.08 billion.[38] When coupled with the lowest BCR valuation of record—$272 million, *see supra* n. 25,—if the Claims Threshold is satisfied, the total value of the settlement would equal at least $1.352 billion. An aggregate award of attorneys' fees of $90 million would, therefore, constitute 6.7% of the total fund then available to class members. Based on the discussion herein, an award of 6.7% is fair and reasonable. Moreover, an award of 6.7% comports with the Fee Examiner's recommendation of an award of 7–8%. *See* Fee Report at 67–68.

#### (b) 5% of the Future Fund

In the event the Claims Threshold is not satisfied, perhaps the outreach program was not as successful as anticipated. Consequently, plaintiffs' counsel will not be entitled to an automatic award of attorneys' fees. Instead, if the Claims Threshold is not satisfied, the Court will award a contingent fee with respect to the Future Fund; plaintiffs'

36. The Court also notes, as discussed *infra*, that the aggregate percentage of recovery will likely be much lower.

37. The Court views this portion of the attorneys' fee award as akin to the portion of the attorneys' fee award contemplated by Section K.2(i) of the Settlement Agreement. That section provides for an award of $45 million (one-half of the $90 million requested), plus expenses, to be paid within five days of this Court's approval of the fee request. While the Court does not here approve the parties' fee agreement as proposed, the Court is mindful of the agreement and, where fair and reasonable, seeks to uphold the terms of that agreement. For the reasons expressed herein, the Court views an immediate payment of $45 million to be fair and reasonable. The Court realizes that 11% of $410 million equals $45.1 million In keeping with the Settlement Agreement, however, the Court will restrict the award to $45 million, plus expenses. The Court also concludes that the 11% award should be based on the entire value of $410 million. While some could argue that the value of the Minimum Fund should be discounted under a present value analysis, the Court notes that the $410 million is fairly viewed as immediately available to class members. Indeed, payments on claims will be-

gin in the next few months. As such, no present value discount is warranted here.

The Court is aware that it has not added the award of attorneys' fees to the value of the Minimum Fund (*i.e.* a total value of $455 million ($410 million plus $45 million)) for purposes of calculating this award. In restricting the award to $45 million, however, the Court deemed this addition unnecessary.

Krell argues that the structure of the payment of these fees is improper. Ironically, however, the fee structure in *Willson v. New York Life Ins. Co.*, in which Malakoff submitted a request for fees, was similar to that here. Malakoff did not object to the fee structure in *New York Life*. The Court sees nothing improper in the parties' agreement to pay half of the attorneys' fees as soon as the Court approves the settlement and fee request.

38. Prudential has guaranteed $260 million per 110,000 remediated claims (up to a maximum of 330,000 claims) under the ADR program. Thus, if 330,000 claims are remediated, Prudential's guarantee equals $780 million. In addition, if 330,000 claims are remediated under the ADR program, Prudential has guaranteed an additional remediation amount of $300 million. The $1.08 billion is the sum of these guarantees.

counsel shall be entitled to an award of attorneys' fees equal to 5% of the Future Fund—the *total* value of the settlement less the Minimum Fund. This second portion of the fee shall be administered and become payable as follows. On each anniversary of this Opinion (or the first business day thereafter), Prudential.shall provide plaintiffs' Co–Lead Counsel with an accounting of the total value of benefits assessed, even if unpaid, under the Settlement Agreement, including all guaranteed payments (the "Assessed Benefits") through the March 1 preceding the anniversary date.[39] With respect to the amount of Assessed Benefits in excess of the Minimum Fund, plaintiffs' counsel shall be awarded an additional attorneys' fee equal to 5% of such excess. This portion of the fee, if any, shall be payable by Prudential to Co–Lead Counsel on the anniversary date of this Opinion (or the first business day thereafter), subject, however, to the terms of the Settlement Agreement. Thus, any part of the Future Fund attorneys' fees that becomes payable on an anniversary date that occurs prior to the date on which the settlement becomes final shall not be paid until the settlement actually becomes final. Within five business days of the date the settlement becomes final, Prudential shall pay to plaintiffs' Co–Lead Counsel all accrued attorneys' fees with respect to the Future Fund. Any payment that becomes payable on an anniversary date that occurs after the settlement becomes final shall be paid within five business days of the anniversary date.

This annual calculation and payment (or accrual of payment) shall occur on each anniversary of this Opinion until either of the following occurs: (1) the attorneys' fees and expenses made payable to plaintiffs' counsel total $90 million or (2) the date on which the parties reasonably conclude that all class members' claims have been administered and the value of the settlement has reached its maximum. The Court emphasizes that, in deference to the terms of the Settlement Agreement, the total amount of attorneys' fees and expenses awarded pursuant to this Opinion shall *not* exceed $90 million.[40]

### (c) Benefits of Bifurcating the Fee Award

The Court realizes that this bifurcated fee award is unique. Indeed, this settlement is unique. For the reasons discussed herein, however, the Court concludes that this award is fair and reasonable.[41] In addition, the Court pauses to highlight several additional benefits, not previously discussed, of this fee structure under the facts of this case.

First, the fee award obviates the need to guesstimate the value of the settlement and ensures an award of attorneys' fees that is rationally related to the success of the settlement. *See In re First Fidelity Bancorp. Sec. Litig.*, 750 F.Supp. 160, 164 (D.N.J.1990) ("[T]he public should readily accept a fee

---

**39.** The Court recognizes that the structure of certain of the remedies under the Settlement Agreement may prevent Prudential from being able to establish a true value of the remedies assessed each year. The Court is confident, however, that the parties will be able to agree jointly on a reasonable methodology for valuing the remedies. The Court will retain jurisdiction to resolve any disputes with respect to attorneys' fees.

**40.** Krell contends that Prudential should not be allowed to pay any attorneys' fees because it is a mutual insurance company. Krell's Br. in Support of Motion to Allow Discovery on Lead Counsel's and Prudential's $90,000,000 Attorney Fee Agreement at 10–12. Because any such payment of fees may come from the proceeds of director and officer liability insurance or from Prudential's capital surplus, the Court rejects this argument. As discussed in the Fairness Opinion, an award of attorneys' fees, paid by Prudential, will not necessarily affect policyholders' future dividends and interest payments on their policies. *See* Fairness Opinion, Conclusions of Law § V.G.

**41.** Notwithstanding the Court's determination here, the Court recognizes that alternative fee awards may also be deemed fair and reasonable under the facts of this case. For example, the Court could have factored into the Minimum Fund a value of the BCR or the various other guaranteed payments under the Settlement Agreement that are based on the number of claims remediated. *See supra* n. 38; Fairness Opinion, Findings of Fact § IV.C (describing the additional financial commitments). Indeed, if the Court had the benefit of knowing the number of claims filed as of the date of this Opinion, the Court would have been better able to establish a reasonable valuation of the settlement. For example, if as of the date of this Opinion the Court knew that 330,000 election forms had been filed requesting the ADR program, the Court would have lent significantly more credence to Hoyer's valuation of $1.987 billion.

which is proportional to the benefit derived and conferred, although not directly to the time devoted."). While some may argue that the Court could have reasonably established the total value of the settlement, the Court demurs. The Court certainly can value the Minimum Fund. But the Court cannot reasonably value the Future Fund; where the Court has in hand one expert report, which acknowledges the tenuous nature of his valuation, and a report of an independent Fee Examiner, which concludes that the possible valuation range spans an $800 million chasm, representing at the valuation extremes a differential of 67%, no "reasonable" valuation can be made.

Second, the fee award upholds the preference for percentage awards in common fund cases and avoids the several problems connected with the lodestar method identified by the Third Circuit Task Force, many of which (e.g., the increased workload of the judicial system) would be strongly implicated here. See GM Trucks, 55 F.3d at 822; Court Awarded Attorneys' Fees, 108 F.R.D. at 246–49.[42]

Third, while the Court believes that there exists a strong likelihood that the settlement will be successful and that plaintiffs' counsel will inevitably receive their requested $90 million in fees and expenses, the Court has determined that some safeguard is necessary to protect against the possibility of an unsuccessful settlement. Plaintiffs' counsel may be disappointed that the Court did not approve their $90 million fee request, as submitted. However, if the Claims Threshold is satisfied or if the true value of the settlement even approaches the estimated value of the settlement put forth by Hoyer, and relied upon by plaintiffs' counsel, plaintiffs' counsel will receive the totality of their fee request.[43] Moreover, even under the worst case scenario—if the value of the settlement fails to exceed $410 million (an improbable event in the Court's view)—plaintiffs' counsel will still receive $45 million, plus expenses, a fair and reasonable award of attorneys' fees on the Minimum Fund in this Class Action.

Fourth, the fee award generally upholds the agreement of the parties, which, assuming the Court approved the $90 million fee request, called for an immediate payment of $45 million plus expenses and a separate payment of the balance after the settlement is made final. Here, plaintiffs' counsel will immediately receive $45 million plus expenses and potentially could receive the balance of the $90 million once the settlement is final.

Fifth, plaintiffs' counsel has significant ongoing responsibilities with respect to administering the settlement, promoting the success of the outreach program and overseeing

---

**42.** Courts have criticized the lodestar method, for among other reasons, as "encourag[ing] lawyers to expend excessive hours, and, in the case of attorneys presenting fee petitions, [to] engage in duplicative and unjustified work, inflate their 'normal' billing rate, and include factitious hours or hours already billed on other matters." Court Awarded Attorneys' Fees, 108 F.R.D. at 248. Notwithstanding that this Court presumes counsel's integrity, together with the other reasons expressed in this Opinion, and in light of plaintiffs' counsel's ongoing responsibilities, the Court views the use of the lodestar method inadvisable here.

**43.** In the event the Claims Threshold is not satisfied, the value of the settlement must still reach roughly $1.3 billion for plaintiffs' counsel to receive $90 million in attorneys' fees; the total value of the settlement must reach, at most (depending on the amount of expenses), $1.31 billion (11% of $410 million = $45 million; plus 5% of the next $900 million = $45 million) Hoyer's valuation of the settlement is $1.987 billion. Hoyer Aff. ¶ 19. On a settlement value of $1.31 billion, an award of $90 million in attorneys' fees would equal 6.9%. As with the 6.7% award that would result if the Claims Threshold is satisfied, an aggregate percentage of 6.9% is fair and reasonable under the circumstances of this case. Again, while the Court's methodology for determining this aggregate percentage differs from that used by the Fee Examiner, the aggregate percentage of 6.9% is consistent with the Fee Examiner's recommendation of a fee award equal to 7–8% of the settlement's value. See Fee Report at 67–68. Moreover, it is important to consider that the aggregate percentage will continue to decrease as the value of the settlement increases. If Hoyer's estimate of $1.987 billion proves valid, the award of $90 million would equal 4.5%; if the settlement reaches a value of $2.5 billion, the percentage would equal 3.6%. As such, the Court's award of attorneys' fees may be viewed as embodying, to some extent, the concept of a sliding scale of attorneys' fees. See Court Awarded Attorneys' Fees, 108 F.R.D. at 256 ("the percentage will decrease as the size of the fund increases").

the remediation of claims. At the Fairness Hearing, one objector opined that if the Court awarded plaintiffs' counsel the requested fee, plaintiffs' counsel would have no financial motivation to perform their duties. Fairness Hr'g Tr. at 155–56 (comments of Susan Chin ("I also recognize that [plaintiffs' counsel] is going to be paid significantly before the ADR process will take place, so I don't know how much incentive there is for plaintiffs' counsel to monitor that process closely, and I fear that it will not be monitored by anybody, and the policyholders will be just left in the dust.")). While the Court firmly believes that plaintiffs' counsel, under any circumstances, will diligently and professionally carry out their responsibilities to the best of their abilities, all interested parties should be assured that this fee structure reenforces the motivation underlying plaintiffs' counsel's efforts to extend the outreach program and to pursue vigorously the fair adjudication of claims—the greater the number of claimants, the greater the award of attorneys' fees.[44]

Sixth, this fee arrangement answers the few class members, including Krell, who objected to the parties' fee agreement as a "lay down" by Prudential. The Court needed no

reminder from objectors that "[d]efendants in common fund cases have no incentive to scrutinize fee requests, and individual fund beneficiaries generally lack sufficient incentive to do so." *FJC Fees* at 66. It is for this reason that the Court reviewed this Fee Petition with heightened scrutiny. *See In re Fine Paper Antitrust Litig.,* 751 F.2d 562, 583 (3d Cir.1984); *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 519 (1st Cir.1991) (In case of "clear sailing" agreement (*i.e.,* where the party paying the fees agrees not to contest the court-awarded amount as long as it does not exceed a negotiated ceiling), "rather than merely rubber-stamping the request, the court should scrutinize it to ensure that the fees awarded are fair and reasonable."). All interested parties should be assured that this Fee Petition received the appropriate judicial review.

## E. Cross-Check Against the Lodestar

Plaintiffs' counsel has submitted an analysis of the lodestar, as of January 31, 1997,[45] from the 25 firms that have worked on this Class Action. That analysis reflects a lodestar of $17,669,651.23,[46] plus expenses of $3,41,115.00.[47] Properly updated, the lodestar would be even higher.

---

**44.** The concept of aligning counsel's financial interests with the interests of their clients is at the heart of contingent fee arrangements. In the typical common fund case, the contingent arrangement is settled after the fact. Indeed, one purpose of the percentage-of-recovery method is to reward counsel based on the monetary benefits created for class members. *See FJC Fees* at 65–66. In the more ordinary litigation, parties negotiate the contingency percentage before the case begins. Here, one part of the monetary benefits is known and a second part of the monetary benefits cannot reasonably be established. With respect to the former part, the Court has followed the long list of prior common fund opinions and awarded an appropriate percentage of that recovery as attorneys' fees; with respect to the latter, unknown part of the fund, the Court has established the contingent fee in light of the facts of this case and the agreement made between plaintiffs' counsel and Prudential.

**45.** The lodestars of two of the firms are through December 31, 1996, and for three of the firms, through October 31, 1996.

**46.** This lodestar excludes the fees and expenses incurred in connection with a Court-ordered investigation of Prudential's document destruction. Pursuant to this Court's Order dated January 6,

1997, Prudential paid all costs associated with the investigation. Therefore, these costs are appropriately excluded from the lodestar. The Court notes that the fees and expenses incurred in the investigation equalled approximately 3.5% of the total lodestar and expenses. While the parties have not submitted the number of hours spent on the investigation, for purposes of this cross-check, the Court will reduce by 3.5% the total number of hours claimed (78,349.62 hours reduced by 3.5% = 75,607.38).

**47.** Krell raises numerous objections with respect to the lodestar summary submitted by plaintiffs' counsel. The Court pauses to address some of these objections. Krell primarily argues that the time records are inadequate and cannot be relied upon to determine a reasonable award of attorneys' fees. *See* Krell's Objections to the Fee Examiner's Report and Recommendation at 14.

The Court disagrees. In this case, the Court uses the lodestar solely to double check the percentage determination; this use does not require the detailed time reports that would otherwise be required under a full lodestar analysis. Moreover, as stated above, the lodestar used here is *understated.* An updated lodestar would only further confirm the reasonableness of the fee award.

While because of the nature of the fee award with respect to the Future Fund, the Court cannot precisely state what the multiplier of the lodestar will be, the Court can fairly state the range of multipliers. At the minimum, based solely on what is known at this time—the award of $45 million, the fee equals 2.55 times the January 31, 1997 lodestar, and results in an average hourly rate of $574.35 per hour. At the maximum, if plaintiffs' counsel eventually receive the entire $90 million award, the fee would equal 5.1 times the January 31, 1997 lodestar, and would result in an average hourly rate of $1148.70 per hour. Notably, these calculations exclude any consideration of expenses and ignore the fact that the lodestar used here excludes billable time in February 1997 and beyond. When factored into the calculation, these facts would significantly lower the multipliers and average hourly rates.

Nevertheless, even under the highest figures shown above, the results are substantially less than the multiplier and the average hourly rate resulting from the fee awarded in *Weiss v. Mercedes–Benz of N. Am., Inc.*, 899 F.Supp. 1297, 1304 (D.N.J.) (awarding fee that resulted in a multiple of 9.3 times the lodestar and an average hourly rate of $2,779.63), *aff'd*, 66 F.3d 314 (3d Cir.1995). It bears repeating that *Mercedes–Benz* is significant because it was decided several months *after GM Trucks*, and because it was later affirmed by a Third Circuit panel which included Judge Becker, the author of the *GM Trucks* opinion.

Accordingly, a cross-check under the lodestar method confirms that the fees and ex-

Nevertheless, Krell contends that the Court cannot consider the time records submitted here because it is impossible to ascertain from the records submitted, among other things, (1) whether any attorneys billed time for completing non-attorney work, (2) whether the records are duplicative, (3) whether the time claimed includes time spent preparing the fee petition, and (4) the amount of time spent on discovery since October 28, 1996, which Krell asserts was unnecessary. Krell avers that the time records should exclude any time spent in these respects. With respect to items (1) through (3), the Court generally agrees; attorneys *should not bill for such* time. With respect to item (4), the Court recognizes that some due diligence was necessary after October 28, 1997. *See* Fee Hr'g Tr. at 39–40 (comments of M. Weiss). Moreover, during the time after that date, plaintiffs' counsel were involved in several other time consuming tasks, namely "helping monitor 500,000 telephone calls from class members ... negotiating the outreach program ... preparing settlement agreements and notices ... [and] preparing the papers in support of the settlements." *Id.* at 40. Thus, the Court sees no "red flag" with respect to the billable time accrued by plaintiffs' counsel after October 28, 1997.

Further, unlike Malakoff, the Court does not presumptively doubt the integrity of the lawyers involved in this case. "The Supreme Court has said that counsel are expected to exercise billing judgment." *FJC Fees* at 22. In light of this fact, and in consideration of the limited use, and understated nature, of plaintiffs' counsel's lodestar, the Court finds the time records adequate. The Court will not entertain Krell's implicit request to conduct a second litigation on attorneys' fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (holding that a request for attorneys' fees should not result in a "second major litigation").

The Court parenthetically notes, with amazement, that the time records submitted by Malakoff in support of his fee request in *Willson v. New York Life Ins. Co.* were virtually identical to those submitted by plaintiffs' counsel here which Malakoff argues are patently inadequate. *See* Weiss Supp. Aff. Ex. E (Malakoff's fee affidavit from *New York Life*). Like the fee affidavits here, Malakoff's affidavit in *New York Life* included the total number of hours worked, the hourly rate, the total fee requested and a list of expenses. *See id.* While the Court has evaluated the adequacy of the time records without regard to this point, the Court questions the sincerity of Malakoff's position with respect to he adequacy of the time records.

Finally, Krell objects to the fee requested by the Law Offices of Eric D. Freed. *See* Colder Third Aff. Through an affidavit submitted by Malakoff's paralegal, Krell points out, *inter alia*, (1) certain problems experienced when attempting to contact the Law Offices of Eric D. Freed and (2) errors in the biographical information of the five attorneys in Freed's office who claimed fees in this Class Action. In her affidavit, Colder reveals, as though indicative of wrongdoing, that one of the attorney's middle initials was misstated in Freed's affidavit in support of the fee petition. *See id.* at n. 10. Colder also claims that Freed falsely asserts membership in the American Bar Association. *See id.* at n. 13. Freed *responded to Colder's* allegations and submitted, in support of his fee petition, the affidavit of Professor Roy Simon, the Director of the Hofstra University School of Law Institute for the Study of Legal Ethics. Upon review of these materials, the Court concludes that, while Freed may be guilty of certain irrelevant and unintended mistakes in the biographical information provided in his affidavit, the mistakes have no bearing on the integrity of his fee request.

penses awarded here are fair and reasonable under the circumstances of this case. *Cf.* 3 *Newberg* § 14.03 ("Multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied. A large common fund award may warrant an even larger multiple.") (citations omitted)

## IV. Objectors' Attorneys' Fees

■ As a final matter, the Court rules on the petitions for fees submitted by the attorneys for objectors Treadway, Parnell and Ginsberg (the "Treadway Attorneys") and for objector Beauvias (the "Beauvias Attorney," and collectively the "Objectors' Attorneys").[48] The Treadway Attorneys clude to fees and expenses of $178,272.80; the Beauvias Attorney claims total fees and expenses of $95,831.14. These figures represent the respective attorneys' unenhanced lodestar plus expenses. The Treadway Attorneys and Beauvias Attorney are the only objectors' counsel who have submitted a petition for attorneys' fees.

The Objectors' Attorneys argue that the work they performed in presenting objections was beneficial to the class and should be compensated regardless of whether the Court accepts their objections or incorporates their objections into the Fairness Opinion. The Treadway Attorneys cite three specific objections or suggestions that they made in this Class Action: (1) that the Settlement Agreement include a presumption that policyholders having "exact match" churned policies and "even premium/odd face amount" policies were defrauded; (2) that policyholders' claims be initiated and remediated without requiring class member action; and (3) that the Court appoint a custodial receiver or special fiscal agent for Prudential. *See* Treadway Attorneys' Pet. for Objectors' Counsel's Fees at 1–2. The Beauvias Attorney does not cite any specific objections or suggestions,[49] but simply argues that its sug-

gestions, as well as its "critical and vigorous review of the settlement," warrant reimbursement of its fees and expenses. Mem. to the Court Regarding Fees and Expenses Applied for by the Beauvias Attorney at 1.

■ "[T]he trial judge has broad discretion in deciding whether, and in what amount, attorneys' fees should be awarded, [because] he is in the best position to determine whether the participation of objectors assisted the court and enhanced the recovery." *White v. Auerbach,* 500 F.2d 822, 828 (2d Cir.1974). "An objector to a class action settlement is not generally entitled to an award of counsel fees." *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 358 (N.D.Ga.1993). Nevertheless, "an attorney whose actions have conferred a benefit upon a given group or class of litigants may file a claim for reasonable compensation for his efforts." *In re Anchor Sec. Litig.,* 1991 WL 53651, Fed. Sec. L. Rep. at 96,078 (E.D.N.Y. 1991) (quoting *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1098 (2d Cir.1977)). Faced with such a claim, the Court should consider "whether the efforts of objectors' counsel improved the settlement, assisted the court, and/or enhanced the recovery in any discernible fashion." *Id.* Moreover, where the objections filed "produced a beneficial effect upon the progress of the litigation, an award of fees is appropriate." *In re Domestic Air Transp.,* 148 F.R.D. at 358 (quoting *Frankenstein v. McCrory Corp.,* 425 F.Supp. 762, 767 (S.D.N.Y.1977)). "If objectors' appearance sharpens the issues and debate on the fairness of the settlement, their performance of the role of devil's advocate warrants a fee award." *Id.*

This Court has been intimately involved with this Class Action and is aware of each objection raised by the Objectors' Attorneys. The Court finds that the Objectors' Attorneys neither improved the settlement, assisted the Court nor enhanced the recovery.[50]

---

**48.** The Treadway Attorneys include two firms: Krislov & Associates, Ltd. and McCusker, Anselmi, Rosen & Carvelli. The Beauvias Attorney is the firm of Fleming, Hovenkamp & Grayson, P.C.

**49.** The Court, however, is aware of the Beauvias Attorney's objections. *See generally* Motion and

Mem. of Law Filed by Objector Brent A. Beauvias in Opposition to the Proposed Settlement.

**50.** Indeed, the objections of the Objectors' Attorneys were not novel to this Court, as their objections were also raised by the several states, in particular, Florida and Massachusetts, who pre-

Similarly, the Objectors' Attorneys did not advance the progress of the litigation or sharpen any issues. For these reasons, the Court will deny the Objectors' Attorneys' request for attorneys' fees.

## V. Conclusion

For the reasons expressed above, the Court will (1) award plaintiffs' counsel an amount of attorneys' fees and expenses equal to (a) $45 million, plus expenses incurred through March 17, 1997, to be paid by Prudential to Co–Lead Counsel within five business days of the date of this Opinion and (b) an additional amount to be determined and paid by Prudential in accordance with this Opinion; provided, however, that the aggregate amount of attorneys' fees and expenses shall not exceed $90 million; (2) deny Krell's Motion to Disqualify the Fee Examiner; (3) deny the Treadway Attorneys' and the Beauvias Attorney's requests for objectors' attorneys' fees; and (4) retain jurisdiction to resolve any disputes with respect to attorneys' fees in this Class Action.

An appropriate Order is attached.[51]

### ORDER & JUDGMENT

In accordance with the Court's Opinion filed herewith,

It is on this 20th day of March, 1997,

ORDERED that plaintiffs' counsel's fee petition is granted in part and denied in part; plaintiffs' counsel in this Class Action shall be entitled to a bifurcated award of attorneys' fees and expenses to be calculated and paid as follows:

(1) $45 million, plus all reasonable and documented expenses incurred through March 17, 1997, to be paid by Prudential to plaintiffs' Co–Lead Counsel within five business days of the date of this Opinion; and

(2) either (a) in the event that 330,000 election forms are submitted electing the Alternative Dispute Resolution program of the settlement by June 1, 1997, $45 million (less any expenses paid in accordance with (1) above), or (b) in the event that this 330,000 elections filed threshold is not satisfied, 5% of the total actual value of the settlement in excess of $410 million. In accordance with the Opinion, this second part of the award of attorneys' fees and expenses shall be paid by Prudential to plaintiffs' Co–Lead Counsel no sooner than the date on which the settlement is made final (i.e., when all appeals of the settlement have been adjudicated), nor later than five business days after the date on which the settlement is made final (unless additional anniversary dates are necessary to achieve additional amounts up to an aggregate total of fees and expenses of $90 million).

In no event, however, shall the aggregate award of attorneys' fees and expenses calculated under (1) and (2) above exceed $90 million. For the reasons expressed in the Opinion, this bifurcated award of attorneys' fees and expenses is fair and reasonable under the circumstances of this Class Action; and it is further

ORDERED that objector Krell's Motion to Disqualify the Fee Examiner is denied; and it is further

ORDERED that the petitions for objectors' attorneys' fees and expenses filed by the attorneys for objectors Treadway, Parnell and Ginsberg and by the attorney for objector Beauvias are denied; and it is further

ORDERED that the Court will retain jurisdiction to resolve any disputes with respect to attorneys' fees and expenses in this Class Action.

---

viously and consistently objected to the settlement.

51. A note of gratitude is extended to my law clerk, David Yawman, whose insight and clear

vision permitted the Court to advance a novel theory of fee allocation that, notwithstanding its novelty, comports with substantial justice and embraces the public interest.